SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**James Hitesman v. Bridgeway, Inc. (A-73-12) (072466)**

**Argued November 18, 2013 -- Decided June 16, 2014**

**PATTERSON, J., writing for a majority of the Court.**

In this appeal, the Court considers whether a health care worker may base a Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, action upon his employer's purported violation of standards set forth in a professional code of ethics, an employee handbook, and the employer's statement of patient rights.

Plaintiff James Hitesman worked as a staff nurse in a nursing home operated by Bridgeway, Inc. (Bridgeway). Upon hire, plaintiff signed a confidentiality agreement in which he agreed not to disclose confidential patient information and acknowledged that if he did so, he would be subject to termination. By 2006, plaintiff was a shift supervisor, with responsibility to oversee nursing staff throughout the facility. In that capacity, plaintiff created records that he termed "administrative logs" or "shift logs," in which he documented patient admissions and hospitalizations, employee absences, facility maintenance issues, and other similar events.

In January 2008, plaintiff recorded in his administrative log that five staff members had missed work due to respiratory and gastrointestinal symptoms, and noted a prevalence of similar symptoms among patients. Thereafter, plaintiff complained to the facility's management about the rate of infectious diseases among patients, reported his concerns to governmental agencies and the press, and ultimately disclosed partially-redacted patient records to a television reporter. On January 25, 2008, Bridgeway terminated plaintiff's employment based upon his contact with the media and his disclosure of Bridgeway records, in violation of Bridgeway's confidentiality policy and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C.A. §§ 1320d-1 to -9.

Plaintiff filed the instant action, alleging a violation of CEPA's bar of employer retaliatory action against a licensed or certified health care employee who reports on, or objects to, an employer activity that the employee reasonably believes to constitute "improper quality of patient care." N.J.S.A. 34:19-3(a)(1); N.J.S.A. 34:19-3(c)(1). He also relied upon N.J.S.A. 34:19-3(c)(3), which bars retaliation against an employee who objects to an employer activity that the employee reasonably believes to be "incompatible with a clear mandate of public policy concerning the public health." The trial court granted partial summary judgment to plaintiff, finding that he had a "reasonable belief" that Bridgeway provided "improper quality of patient care." On Bridgeway's motion for reconsideration, the court determined that the jury should assess the objective reasonableness of plaintiff's belief that Bridgeway violated a law or public policy. The court concluded, however, that plaintiff could rely on the American Nursing Association (ANA) Code of Ethics and two Bridgeway policy documents in support of his claims, and cited additional sources of law and public policy, including CDC guidelines and federal and state regulations addressing infection control.

At trial, Bridgeway moved for an involuntary dismissal following plaintiff's testimony. The court denied the motion, reasoning that the ANA Code could serve as an authority for the purposes of assessing whether plaintiff had an objectively reasonable belief that Bridgeway provided improper health care or violated public policy. The jury found Bridgeway liable under CEPA, but awarded no damages. The Appellate Division reversed the liability verdict, holding that plaintiff's CEPA claim failed as a matter of law because the authorities that he relied upon -- the ANA Code, the Bridgeway Employee Handbook and the Bridgeway Statement of Resident Rights -- neither measured the adequacy of patient care, nor expressed a clear mandate of public policy. Hitesman v. Bridgeway, Inc., 430 N.J. Super. 198, 219 (App. Div. 2013). The Court granted certification. 214 N.J. 235 (2013).

**HELD**: Claims asserted under CEPA's "improper quality of patient care" provision must be premised upon a reasonable belief that the employer has violated a law, rule, regulation, declaratory ruling adopted pursuant to law, or a professional code of ethics that governs the employer and differentiates between acceptable and unacceptable conduct in the employer's delivery of patient care. N.J.S.A. 34:19-3(a)(1); N.J.S.A. 34:19-3(c)(1). Claims asserting that an

1

employer's conduct is incompatible with a "clear mandate of public policy concerning the public health" must, at a minimum, identify authority that applies to the "activity, policy or practice" of the employer. N.J.S.A. 34:19-3(c)(3).

1. A motion for an involuntary dismissal pursuant to Rule 4:37-2(b) must be denied if the evidence, and the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor. To the extent that the trial court's judgment on the motion for dismissal was premised upon its interpretation of CEPA, the Court's review is de novo. The Court construes a statute so as "to determine and give effect to the Legislature's intent." (pp. 18-19)

2. CEPA is a remedial statute that promotes a strong public policy of the State and therefore should be construed liberally to effectuate its important social goal. The "clear mandate of public policy concerning the public health" provision of CEPA bars any retaliatory action against an employee because the employee "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J.S.A. 34:19-3(c)(3). The "improper quality of patient care" provisions contained in N.J.S.A. 34:19-3(a)(1) and (c)(1), bar retaliation against certified health care professionals who report or object to practices that they reasonably believe constitute improper quality of patient care, as defined by N.J.S.A. 34:19-2(f). (pp. 20-23)

3. To succeed on his CEPA claims under N.J.S.A. 34:19-3(a)(1) and (c)(1) (improper quality of patient care) and N.J.S.A. 34:19-3(c)(3) (clear mandate of public policy concerning public health), plaintiff must prove four elements: (1) he reasonably believed that Bridgeway either provided an improper quality of patient care or acted in a manner incompatible with a clear mandate of public policy; (2) he engaged in protected "whistle-blowing" activity; (3) an adverse employment action was taken against him; and (4) there was a causal connection between his whistle-blowing activity and his termination. Only the first and fourth elements are at issue in this matter. (pp. 23-24)

4. Plaintiff need not show that Bridgeway actually violated a law, rule, regulation, or other authority, but only that he held a reasonable belief that such a violation occurred. For a CEPA claim alleging improper quality of patient care to be submitted to the jury, the court must find a substantial nexus between the employer's practice, procedure, action or failure to act, and the improper quality of patient care. If the plaintiff establishes the substantial nexus, the jury then considers whether plaintiff reasonably believed that the authority cited was violated. The same factors guide the analysis with regard to a "clear mandate of public policy" claim under N.J.S.A. 34:19-3(c)(3). (pp. 24-27)

5. To present a cognizable retaliation claim based on "improper quality of patient care" or practices "incompatible with a clear mandate of public policy concerning the public health," a plaintiff must present authority that serves as a standard for the employer's conduct. Here, plaintiff relied upon three purported sources of authority: the ANA Code, Bridgeway's Employee Handbook, and its Statement of Resident Rights. Although a professional code of ethics governing an employer's activities may constitute authority for purposes of a CEPA action, the ANA Code provided no standard for Bridgeway's control of infectious disease, and thus cannot support plaintiff's CEPA claims. Similarly, the Bridgeway policy documents neither defined acceptable patient care nor stated a clear mandate of public policy for purposes of a CEPA action. Because none of plaintiff's purported sources of authority meet the statutory criteria that serves as a standard for the employer's conduct, they cannot form the basis of a retaliation claim under N.J.S.A. 34:19-3(a)(1) and (c)(1) or N.J.S.A. 34:19-3(c)(3). (pp. 27-38).

6. Regarding the additional sources of authority cited by the trial court in a pretrial summary judgment motion, such as the "standard precautions" and other guidance derived from state or federal law, the proper inquiry is not whether factual assertions and legal arguments could have been made to support the plaintiff's claim. Rule 4:37-2(b) limits the trial court to the evidence in, and inferences that may be drawn from, the trial record. Nothing in that rule authorizes a trial court to incorporate by reference any source extraneous to the trial record as a basis to deny a motion for involuntary dismissal. (pp. 38-41).

The judgment of the Appellate Division is **AFFIRMED**.

**JUSTICE ALBIN**, **DISENTING**, expresses the view that the trial court properly denied Bridgeway's motion for an involuntary dismissal, because, when viewed in the light most favorable to plaintiff, the evidence supported the conclusion that plaintiff reasonably believed that Bridgeway was violating laws and regulations governing the proper quality of patient care – including "standard precautions" deriving from federal and state law – and that he was fired for reporting those purported violations to the appropriate authorities.

**CHIEF JUSTICE RABNER, JUSTICE LaVECCHIA, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE PATTERSON's opinion. JUSTICE ALBIN filed a separate, dissenting opinion.**

JAMES HITESMAN,

    Plaintiff-Appellant,

       v.

BRIDGEWAY, INC., d/b/a
BRIDGEWAY CARE CENTER,

    Defendant-Respondent.


        Argued November 18, 2013 – Decided June 16, 2014

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 430 N.J. Super. 198 (2013).

        Paul R. Castronovo argued the cause for
        appellant (Castronovo & McKinney, attorneys;
        Mr. Castronovo and Megan Frese Porio, on the
        brief).

        Craig S. Provorny argued the cause for
        respondent (Herold Law and Jackson Lewis,
        attorneys; Mr. Provorny, Gregory T. Alvarez,
        and James McDonnell, of counsel).

        Sarah Fern Meil argued the cause for amicus
        curiae New Jersey Chapter of the National
        Employment Lawyers Association.

    JUSTICE PATTERSON delivered the opinion of the Court.

    In this appeal, the Court considers a health care worker's claim asserted under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8, premised upon standards set

forth in a professional code of ethics, an employee handbook, and the employer's statement of patient rights.

Plaintiff James Hitesman's employment as a registered nurse in a nursing home operated by defendant Bridgeway, Inc. (Bridgeway) was terminated in January 2008 after he complained to the facility's management about the rate of infectious diseases among patients, reported his concerns to governmental agencies and the press, and disclosed partially-redacted records of patient care to a television reporter.

In this action, plaintiff alleged a claim under CEPA's provision barring employer retaliatory action against a licensed or certified health care employee who reports on, or objects to, an employer activity, policy, or practice that the employee reasonably believes to constitute "improper quality of patient care." N.J.S.A. 34:19-3(a)(1); N.J.S.A. 34:19-3(c)(1). He also asserted a claim under another CEPA provision barring retaliatory action against an employee who objects to an employer activity, policy or practice that the employee reasonably believes to be "incompatible with a clear mandate of public policy concerning the public health." N.J.S.A. 34:19-3(c)(3). Plaintiff cited the American Nursing Association (ANA) Code of Ethics and two Bridgeway documents -- a portion of its Employee Handbook and its Statement of Resident Rights -- in support of his claim.

2

The trial court denied Bridgeway's motion to dismiss at the close of plaintiff's case and the jury returned a verdict of liability under CEPA, but awarded no damages.  The parties cross-appealed, and an Appellate Division panel reversed plaintiff's liability verdict, holding that plaintiff's CEPA claim failed as a matter of law because he did not demonstrate an objectively reasonable belief that Bridgeway's conduct gave rise to an improper quality of patient care or was incompatible with a clear mandate of public policy.

We affirm.  We hold that claims asserted under N.J.S.A. 34:19-3(a)(1) and (c)(1)'s "improper quality of patient care" provision must be premised upon a reasonable belief that the employer has violated a law, rule, regulation, declaratory ruling adopted pursuant to law, or a professional code of ethics that governs the employer and differentiates between acceptable and unacceptable conduct in the employer's delivery of patient care.  N.J.S.A. 34:19-3(a)(1); N.J.S.A. 34:19-3(c)(1).  We further hold that a plaintiff asserting that his or her employer's conduct is incompatible with a "clear mandate of public policy concerning the public health" must, at a minimum, identify authority that applies to the "activity, policy or practice" of the employer.  N.J.S.A. 34:19-3(c)(3).

Applied here, that standard warrants dismissal of plaintiff's CEPA claims.  Although a professional code of ethics

3

governing an employer's activities may constitute authority for purposes of N.J.S.A. 34:19-3(a)(1), (c)(1) and (c)(3) in an appropriate setting, the ANA Code of Ethics (ANA Code) invoked by plaintiff provided no standard for his employer's control of infectious disease, and accordingly does not support plaintiff's CEPA allegations. The Bridgeway Employee Handbook and Statement of Resident Rights neither defined acceptable patient care nor stated a clear mandate of public policy for purposes of N.J.S.A. 34:19-3(a)(1), (c)(1), or (c)(3). Accordingly, we concur with the Appellate Division panel that the trial court should have granted Bridgeway's motion to dismiss.

I.

We derive the facts of this case from the evidence presented by the parties at trial.

Bridgeway operates the Bridgeway Care Center, a nursing home in Bridgewater. In January 2008, Bridgeway employed 177 people and served approximately 145 patients, most of them elderly. Bridgeway's management team included Chief Executive Officer Donald Pelligrino, also a part owner of Bridgeway, as well as Medical Director Anthony Frisoli, M.D., Director of Nursing Frances Gerber, R.N., and Administrator Wayne Blum.

In December 2003, Bridgeway hired plaintiff to work as a staff nurse in the subacute unit of the nursing home. At the time of his hiring, plaintiff executed a confidentiality

4

agreement in which he agreed not to disclose confidential patient information and acknowledged that if he did so, he would be subject to termination. After a brief period in the subacute unit, plaintiff was assigned to work as a staff nurse in Bridgeway's long-term care unit.

In 2006, Bridgeway promoted plaintiff to the position of shift supervisor, with responsibility to oversee nursing staff in all three wings of the facility during the three p.m. to eleven p.m. evening shift. In that capacity, plaintiff created records that he termed "administrative logs" or "shift logs," in which he would record the entry of new admittees into the nursing home, patient hospitalizations, employee absences for illness or other reasons, extra monitoring provided for particular patients, and facility maintenance issues.

In January 2008, plaintiff recorded in his administrative log that five Bridgeway staff members had missed work due to respiratory and gastrointestinal symptoms, and noted a prevalence of similar symptoms among patients. Plaintiff testified that he attempted to contact Dr. Frisoli about these symptoms during the evening of January 10, 2008. According to plaintiff, he learned of fifty cases of respiratory or gastrointestinal symptoms at Bridgeway. Nursing Director Gerber testified, in contrast, that Bridgeway staff noticed no commonality among the patient illnesses reported at that time.

5

At about midnight on January 11, 2008, plaintiff sent Bridgeway management an e-mail expressing concerns about the "seasonal prevalence of respiratory and GI symptoms" in the facility. Later that day, Gerber responded with an e-mail in which she stated that illnesses could be spread by contact, and noted the importance of hand-washing for staff and residents.

According to plaintiff, at some point on January 11, 2008, he presented to Gerber an article from the Centers for Disease Control and Prevention (CDC) website entitled "Clinical Signs and Symptoms of Influenza."[1] That night, in an e-mail to Gerber, plaintiff demanded an explanation as to how Dr. Frisoli had determined that the illnesses were spread by contact, and inquired as to whether tests or lab work had been performed. Plaintiff testified that he instructed Bridgeway staff about hand-washing and the use of gloves, goggles, masks, and hospital gowns to avoid transmission of infection.

On January 14, 2008, using the pseudonym "Bill Yates," plaintiff reported to the Bridgewater Township Board of Health that there was an increase in respiratory and gastrointestinal symptoms at Bridgeway. According to plaintiff, the Board stated

---

[1] Plaintiff did not contend in his reports to government officials or the media that there was an outbreak of influenza at Bridgeway, and there is no indication in the record that any Bridgeway patients contracted influenza during the relevant period.

that it had no responsibility to oversee health issues, other than kitchen sanitation, at Bridgeway.

The following day, using the same pseudonym, plaintiff contacted the Somerset County Department of Health. The Somerset County Department of Health promptly contacted Gerber, told her that it had a report of major illnesses in the facility, and requested information pertaining to any hospitalizations of residents. Gerber immediately gathered information about patient symptoms and hospitalizations and provided it to the Somerset County Department of Health.

On January 16, 2008, again using the pseudonym "Bill Yates," plaintiff contacted the New Jersey Department of Health and Senior Services (HSS). Plaintiff testified that this third contact with government officials was prompted by his belief that the situation at Bridgeway had not improved and that he had not made progress with municipal or county officials. According to plaintiff, the state health official with whom he spoke advised him that HSS would not get involved with Bridgeway unless asked to do so by Somerset County.

Nonetheless, the day after plaintiff's call, an investigator from HSS contacted Blum, Bridgeway's administrator. According to Blum, the investigator stated that HSS was following up on an anonymous call reporting an "epidemic" at Bridgeway, and asked Blum what his facility was doing to combat

7

the epidemic. Blum testified that he advised the HSS investigator that there was no epidemic, just "our usual things that are going on." The investigator requested that Bridgeway report any issue of concern and advise HSS of its remedial steps and their outcome.

Shortly after the HSS investigator's call to Bridgeway, Gerber and Blum convened a meeting with plaintiff in Blum's office. According to plaintiff, Gerber and Blum asked him whether he had contacted county and state health officials, and plaintiff denied having made the calls.

According to his testimony, plaintiff then learned from another nurse that a patient complaining of gastrointestinal symptoms had been admitted to a hospital during the weekend of January 19-20, 2008, and had died there of septicemia.[2] When no investigator from Bridgewater Township, Somerset County, or the State of New Jersey appeared at Bridgeway over the weekend, plaintiff concluded that his calls to governmental officials had not elicited a satisfactory response, and decided to approach the media.

Plaintiff contacted a local television station on January 22, 2008. He gave the television station copies of Bridgeway

_____

[2] Septicemia is defined as a "[s]ystemic disease caused by the spread of microorganisms and their toxins through circulating blood; formerly called 'blood poisoning.'" Stedman's Medical Dictionary 1750 (28th ed. 2006).

8

administrative logs that he partly, but incompletely, redacted. The documents included some residents' room numbers, which could enable an outsider to identify certain Bridgeway patients.

On the morning of January 23, 2008, Bridgeway Chief Executive Officer Pelligrino was approached by a television news reporter in the facility's parking lot. According to Pelligrino, the news reporter asked him whether he was aware that "people are dying in your building." When Pelligrino expressed confusion about this allegation, the reporter showed Pelligrino the administrative logs and said that he had received them from "someone at Bridgeway." Pelligrino subsequently verified that Bridgeway management had not authorized the documents' release and contacted Bridgeway counsel.

That afternoon, Blum, Gerber and Bridgeway's head of human resources met with plaintiff.[3] Plaintiff admitted that he had contacted municipal, county, and state officials and the news station, citing his obligation as a registered nurse and explaining that he had seen "something that needed to be fixed and it wasn't being fixed." Plaintiff was suspended with pay pending Bridgeway's investigation of his disclosures to the media.

---

[3] Plaintiff recorded the meeting. A portion of the recording, much of it unintelligible, was played at trial.

On January 25, 2008, Bridgeway terminated plaintiff's employment.  Bridgeway management advised plaintiff that he was terminated because of his contact with the media and his disclosure of Bridgeway administrative logs, in violation of Bridgeway's confidentiality policy and the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C.A. §§ 1320d-1 to -9.

## II.

Plaintiff filed this action in the Law Division, seeking compensatory and punitive damages and other relief.  He pled a CEPA claim quoting N.J.S.A. 34:19-3(c)(1), alleging a reasonable belief that Bridgeway practices "constituted improper quality of patient care and violations of [plaintiff's] professional code of ethics (for example, acting on questionable practice under Section 3.5 of the American Nursing Association's Code of Ethics)."  Although plaintiff's complaint did not cite the "clear mandate of public policy" language of N.J.S.A. 34:19-3(c)(3), he relied on that provision of CEPA, as well as N.J.S.A. 34:19-3(a)(1) and (c)(1), before and during trial.

On June 1, 2010, prior to trial, the trial court granted plaintiff's motion for partial summary judgment as to the first element of his CEPA claim -- that plaintiff had a "reasonable belief" that Bridgeway provided "improper quality of patient care" under N.J.S.A. 34:19-3(c)(1).  The trial court granted

10

Bridgeway's motion for reconsideration. Thereafter, the trial court held that plaintiff properly relied upon the ANA Code and Bridgeway Employee Handbook and Statement of Resident Rights in support of his CEPA claim. In support of its decision, the trial court cited additional sources of law and public policy, including CDC guidelines and federal and state regulations addressing infection control.[4] The trial court concluded that plaintiff had met his burden to establish a substantial nexus between Bridgeway's conduct and a law or public policy. It determined, however, that the jury should assess the objective reasonableness of plaintiff's belief that Bridgeway violated the law or public policy cited by plaintiff.

Prior to trial, plaintiff presented a stipulation agreed upon by Bridgeway's prior counsel that the value of plaintiff's lost income claim was $59,000. The trial court determined that plaintiff could rely upon the stipulation at trial.

The case was tried before a jury in February and March of 2011. The parties disputed the cause of plaintiff's dismissal. Plaintiff contended that Bridgeway terminated his employment in retaliation for his communications to municipal, county, and

---

[4] The additional references included 42 C.F.R. § 483.25, requiring nursing facilities to maintain the well-being of their patients, N.J.S.A. 26:2H-93, stating that high-quality nursing home services are in the public interest of New Jersey, and N.J.A.C. 8:39-19.4, mandating "written policies and procedures regarding infection prevention and control" for nursing facilities, and incorporating CDC guidelines.

11

state regulatory authorities about the spread of infections among staff and patients at the nursing home.[5]  Bridgeway asserted that the termination was prompted by plaintiff's disclosure of partially redacted administrative logs to the media, in violation of his confidentiality agreement and HIPAA.

In his proposed jury instruction submitted prior to trial, plaintiff identified a single authority supporting his CEPA claim: section 3.5 of the ANA Code.  Plaintiff testified at trial regarding the ANA Code, stating that it required him to try to improve patient care.  He contended that Bridgeway violated the ANA Code because it did not ensure proper quality of care.  On cross-examination, plaintiff conceded that although the ANA Code applied to him by virtue of his status as a registered nurse, it did not apply to Bridgeway.

Plaintiff further testified that the Bridgeway Employee Handbook required him to comply with the ANA Code and to perform his duties as a registered nurse, and that the Bridgeway Statement of Resident Rights supported his claim because it set forth patients' right to freedom of choice and right to be protected from social isolation.  On cross-examination, plaintiff contended that Bridgeway failed to follow all the "standard precautions" recommended by the CDC and New Jersey

---

[5] Plaintiff did not contend that his contact with the media constituted protected activity for purposes of CEPA.  See N.J.S.A. 34:19-3(a); N.J.S.A. 34:19-3(c).

12

health authorities to control infection, such as hand-washing and the use of masks and gloves. Plaintiff conceded that he did not know what diagnostic tests Bridgeway conducted, whether the patients' illnesses shared a commonality of causes, or whether there was an "epidemic" at the nursing home. He also admitted that his dispute with the facility's Medical Director amounted to a difference of opinion about how best to approach infection control.

Following plaintiff's testimony, Bridgeway moved for an involuntary dismissal under Rule 4:37-2(b). It argued that plaintiff had failed to establish an objectively reasonable basis for his belief that Bridgeway violated the ANA Code. Plaintiff countered that Bridgeway had violated the ANA Code, its Employee Handbook, and its Statement of Resident Rights. The trial court reasoned that the ANA Code could serve as an authority for the purposes of the jury's determination of whether plaintiff had an objectively reasonable belief that Bridgeway provided improper health care or violated public policy. It held that plaintiff had presented a prima facie showing supporting his CEPA claim, and denied Bridgeway's motion to dismiss.

At the jury charge conference, the trial judge noted, and plaintiff confirmed, that plaintiff relied on three sources of law or public policy: the ANA Code, Bridgeway's Employee

13

Handbook, containing its Code of Conduct, and Bridgeway's Statement of Resident Rights. The trial court instructed the jury that "the American Nursing Association's Code of Ethics, Section 3.5, Bridgeway's own Code of Conduct, Bridgeway's Employee Handbook and Bridgeway's Statement of Resident Rights are sources of law or public policy that closely relate to the conduct about which [plaintiff] blew the whistle."[6]

The jury returned a verdict, responding to three questions on the verdict sheet. First, the jury determined that plaintiff had proven "that his belief that Bridgeway provided improper quality of health care or violated the law [or] public policy was objectively reasonable." Second, the jury decided that plaintiff's "reporting to the government was a determinative motivating factor in Bridgeway's decision to terminate his employment." Despite concluding that Bridgeway was liable, the jury found, pursuant to the third question on the verdict sheet, that plaintiff was not "entitled to compensation for past lost pay." The trial court polled the jurors on questions two and three on the verdict sheet, but declined plaintiff's request for further inquiry with respect to the jury's intent when it found

---

[6] The model charge governing CEPA, Model Jury Charge (Civil), 2.32, "New Jersey Conscientious Employee Protection Act," does not include the statutory definition of "improper quality of patient care." N.J.S.A. 34:19-2(f). Consistent with the model charge, the jury was not instructed as to the meaning of that term.

14

liability but no damages.  The trial court then dismissed the jury.

Following the trial, Bridgeway moved for a judgment notwithstanding the verdict pursuant to Rule 4:40-2(b). Bridgeway asserted that the jury's verdict was against the weight of the evidence and that plaintiff had not presented a cognizable CEPA claim.  Separately, plaintiff moved for a new trial pursuant to Rule 4:49-1(a) arguing that the jury's verdict was inconsistent and was the product of jury confusion.  The trial court denied both motions.

Both parties appealed the trial court's judgment. Plaintiff argued that the jury had been confused and had consequently rendered an inconsistent verdict in which it found liability but ignored the parties' stipulated lost income damages.  Bridgeway contended that plaintiff had failed to establish the elements of a CEPA claim and that the jury's liability verdict was against the weight of the evidence.  It maintained, however, that the jury's liability and damages verdicts were not inconsistent.

An Appellate Division panel reversed the liability verdict in plaintiff's favor.  Hitesman v. Bridgeway, Inc., 430 N.J. Super. 198, 219 (App. Div. 2013).  The panel concluded that plaintiff had failed to prove his CEPA claim.  Ibid.  It found that the authorities upon which plaintiff relied -- the ANA

15

Code, the Bridgeway Employee Handbook and the Bridgeway Statement of Resident Rights -- neither measured the adequacy of patient care for purposes of N.J.S.A. 34:19-3(a)(1) and (c)(1), nor expressed a clear mandate of public policy as required by N.J.S.A. 34:19-3(c)(3). Id. at 215-19. The panel held that the liability verdict was accordingly against the weight of the evidence. Id. at 209. It characterized the parties' dispute as nothing more than a "difference of opinion," which did not give rise to a cause of action under CEPA. Id. at 219.

This Court granted certification. 214 N.J. 235 (2013).

### III.

Plaintiff argues that the Appellate Division's holding eviscerates CEPA's 1997 amendments, enacted to protect health care professionals who complain about improper patient care, and that it weakens CEPA's protections for New Jersey employees who notify authorities about employer actions that contravene public policy. He challenges the Appellate Division's rejection of the ANA Code as an authority supporting his CEPA claim, arguing that the panel effectively wrote the "professional code[] of ethics" text out of N.J.S.A. 34:19-2(f). Plaintiff cites case law authorizing courts to use industry guidelines and employer manuals as sources of public policy for purposes of CEPA. Plaintiff also cites on appeal statutory and regulatory provisions, not introduced at trial, that prescribe standards

16

for nursing homes as sources of law and public policy supporting a CEPA claim.  He argues that the jury's liability verdict should be reinstated, and that he is entitled to a new trial on damages or an additur.

Bridgeway counters that the Appellate Division properly found that plaintiff failed to demonstrate that he reasonably believed that Bridgeway delivered an "improper quality of patient care" under N.J.S.A. 34:19-3(c)(1), or that it acted incompatibly with a "clear mandate of public policy" under N.J.S.A. 34:19-3(c)(3).  It contends that plaintiff failed to identify any law, rule, regulation, declaratory ruling, or professional code of ethics that he reasonably believed Bridgeway violated.  Bridgeway argues that the authorities cited by plaintiff -- the ANA Code, the Bridgeway Employee Handbook, and the Bridgeway Statement of Resident Rights -- establish no standard governing the quality of Bridgeway's patient care. Bridgeway further contends that plaintiff failed to demonstrate clearly and convincingly a miscarriage of justice that would justify a new trial on damages or an additur.

Amicus curiae New Jersey Chapter of the National Employment Lawyers Association (NELA-NJ) argues that the Appellate Division's decision in this case forces nursing home employees to choose between their jobs and their ethical obligations. NELA-NJ relies upon the legislative history of CEPA, asserting

17

that it demonstrates clear legislative intent to protect health care professionals who complain about substandard patient care. NELA-NJ defends the trial court's reliance on the ANA Code as a standard that plaintiff reasonably believed that Bridgeway violated. It argues that CEPA incorporates professional codes of ethics in N.J.S.A. 34:19-2(f)'s definition of improper quality of patient care, and that this term is not limited to codes that govern the conduct of employers.

                                    IV.

In this case, we review the trial court's denial of Bridgeway's motion for an involuntary dismissal, filed pursuant to Rule 4:37-2(b) at the close of plaintiff's case. A motion for an involuntary dismissal is premised on "the ground that upon the facts and . . . the law the plaintiff has shown no right to relief." R. 4:37-2(b). The motion "shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2(b). "'[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied.'" Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000) (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 415 (1997)). An appellate court

                                    18

applies this standard when reviewing a trial court's denial of a Rule 4:37-2(b) motion for involuntary dismissal. Fox v. Millman, 210 N.J. 401, 428 (2012). A reviewing court considering an appeal involving a Rule 4:37-2 motion "must disregard evidence adduced on the defense case." Verdicchio v. Ricca, 179 N.J. 1, 30-31 n.4 (2004).

To the extent that the trial court's denial of Bridgeway's motion for an involuntary dismissal was premised upon a construction of CEPA, our review is de novo. Twp. of Holmdel v. N.J. Highway Auth., 190 N.J. 74, 86 (2007). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The Court construes a statute so as "to determine and give effect to the Legislature's intent." N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 20 (2013) (citing Allen v. V & A Bros., Inc., 208 N.J. 114, 127 (2011)). The Court's initial task is to analyze the statute's plain language. DiProspero v. Penn, 183 N.J. 477, 493 (2005). Only if the plain language is ambiguous does the Court look to extrinsic evidence such as legislative history. A.L., supra, 213 N.J. at 20 (citing Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)); see DiProspero, supra, 183 N.J. at 492.

19

"CEPA is a remedial statute that 'promotes a strong public policy of the State' and 'therefore should be construed liberally to effectuate its important social goal.'" Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). That social goal is "to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont, supra, 138 N.J. at 431). The statute thus shields an employee who objects to, or reports, employer conduct that the employee reasonably believes to contravene the legal and ethical standards that govern the employer's activities.

The "clear mandate of public policy concerning the public health" provision of CEPA was an original component of the statute when it was enacted in 1986. See L. 1986, c. 105, § 3. N.J.S.A. 34:19-3(c)(3) bars any retaliatory action against an employee because the employee:

> (c) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> . . .
>
> (3) is incompatible with a clear mandate of public policy concerning the public health,

20

safety or welfare or protection of the environment.

[N.J.S.A. 34:19-3(c)(3).[7]]

For purposes of CEPA, "public policy has been defined as that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 187 (1998) (internal quotation marks omitted). "[A] clear mandate of public policy conveys a legislative preference for a readily discernable course of action that is recognized to be in the public interest." Maw v. Advanced Clinical Commc'ns, 179 N.J. 439, 444 (2004) (internal quotation marks omitted). Public policy "is not concerned with minutiae, but with principles." Mehlman, supra, 153 N.J. at 187 (internal quotation marks omitted). The "clear mandate" must exist to prevent harm to the

---

[7] N.J.S.A. 34:19-3(a) and N.J.S.A. 34:19-3(c) address distinct categories of protected activity. The "clear mandate of public policy" provision of CEPA is found only in N.J.S.A. 34:19-3(c)(3), which bars retaliation by an employer against an employee who "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . is incompatible with a clear mandate of public policy." There is no parallel subsection addressing a "clear mandate of public policy" under N.J.S.A. 34:19-3(a), which is the section of CEPA that bars retaliation for, among other conduct, an employee's reporting of employer conduct "to a public body." Although this issue was not raised by the parties in the trial court or on appeal, it appears that the trial court incorrectly charged the jury that plaintiff could assert a CEPA claim, under N.J.S.A. 34:19-3(c)(3), for retaliation based upon his reports to government officials of conduct that he reasonably believed to be incompatible with a clear mandate of public policy.

public, rather than to protect exclusively private interests. Dzwonar, supra, 177 N.J. at 469.

In 1997, the Legislature amended CEPA to add the second provision upon which plaintiff asserted a claim in this case, the "improper quality of patient care" language of N.J.S.A. 34:19-3(a)(1) and (c)(1). See L. 1997, c. 98, § 2. The amended version of N.J.S.A. 34:19-3(a) bars employer retaliation against an employee who:

> (a) Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care.
>
> [N.J.S.A. 34:19-3(a)(1).]

In a parallel amendment, the Legislature added language to N.J.S.A. 34:19-3(c)(1), which specifically applies to employees in the health care field and bars retaliation against an employee who:

> (c) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or, if the employee is a licensed or certified health care professional,

22

> constitutes improper quality of patient care.
>
> [N.J.S.A. 34:19-3(c)(1).]

As amended, CEPA defines "improper quality of patient care" as "any practice, procedure, action or failure to act of an employer that is a health care provider which violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics." N.J.S.A. 34:19-2(f).

Plaintiff's CEPA claims -- his "improper quality of patient care" claim under N.J.S.A. 34:19-3(a)(1) and (c)(1) and his "clear mandate of public policy concerning the public health" claim under N.J.S.A. 34:19-3(c)(3) -- require proof of four elements. First, plaintiff was required to demonstrate that he reasonably believed that Bridgeway either provided an improper quality of patient care as defined in N.J.S.A. 34:19-2(f), or acted in a manner incompatible with a clear mandate of public policy. See Dzwonar, supra, 177 N.J. at 462; Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38-39 (App. Div.), certif. denied, 185 N.J. 39 (2005); Kolb v. Burns, 320 N.J. Super. 467, 476 (App. Div. 1999). Second, plaintiff had the burden to prove that he engaged in protected "whistle-blowing" activity as defined in N.J.S.A. 34:19-3(a) or 3(c). Dzwonar, supra, 177 N.J. at 462; Klein, supra, 377 N.J. Super. at 38.

23

Third, plaintiff had the burden of proving that an "adverse employment action was taken against him." Dzwonar, supra, 177 N.J. at 462; see Klein, supra, 377 N.J. Super. at 38. Fourth, plaintiff had the burden to demonstrate a causal connection between his whistle-blowing activity and his termination. Dzwonar, supra, 177 N.J. at 462; Klein, supra, 377 N.J. Super. at 38. Because the parties stipulated that the second element was satisfied by plaintiff's contact with governmental authorities, and that the third element was satisfied because his employment at Bridgeway was terminated, only the first and fourth elements of plaintiff's CEPA claim were contested at trial.

In Dzwonar, supra, this Court defined the framework to guide a trial court's determination of a defense challenge to a plaintiff's proof of the first element of a CEPA claim:

> [W]hen a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether the belief was objectively reasonable.
>
> [177 N.J. at 464.]

24

The Court noted that CEPA's goal "is 'not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.'"  Ibid. (quoting Mehlman, supra, 153 N.J. at 193-94).  Accordingly, it is not the plaintiff's burden to show that the defendant actually violated the law, rule, regulation, or other authority cited, but only to demonstrate that he or she held a reasonable belief that such a violation occurred.  Ibid.

Thus, Dzwonar identifies the framework to be used by a trial court in determining a defendant's motion to dismiss CEPA claims under the two provisions at issue here.  In order for a claim under N.J.S.A. 34:19-3(a)(1) and (c)(1), alleging improper quality of patient care, to be submitted to the jury, the trial court must find a substantial nexus, as explained by Dzwonar, supra, 177 N.J. at 464, between the defendant employer's "practice, procedure, action or failure to act," N.J.S.A. 34:19-2(f), and the "improper quality of patient care."  See Maimone v. City of Atlantic City, 188 N.J. 221, 233 (2006); Klein, supra, 377 N.J. Super. at 40; Turner v. Associated Humane Soc'ys Inc., 396 N.J. Super. 582, 593 (App. Div. 2007).  The trial court's task is to determine whether such a substantial nexus exists, reviewing the evidence in accordance with the

25

deferential standard of Rule 4:37-2(b). If the plaintiff's proofs establish the substantial nexus, the trial court should deny the defendant's motion to dismiss. It should then charge the jury to consider whether plaintiff believed that the authority cited was violated, and if so, whether that belief was reasonable. If the jury decides in the affirmative, plaintiff has proven the first element of the CEPA claim. See Dzwonar, supra, 177 N.J. at 464; Klein, supra, 377 N.J. Super. at 39-40. If the trial court determines that the plaintiff's proofs failed to establish the substantial nexus, it should grant the defendant's motion, and dismiss the N.J.S.A. 34:19-3(a)(1) or (c)(1) claim.

The same factors guide a trial court's analysis in deciding a motion to dismiss a plaintiff's "clear mandate of public policy" claim under N.J.S.A. 34:19-3(c)(3). Dzwonar, supra, 177 N.J. at 464. The trial court must determine whether there is a substantial nexus between the complained-of conduct and a "clear mandate of public policy" identified by the court or the plaintiff. Ibid. If the trial court, reviewing the evidence under the standard of Rule 4:37-2(b), determines that the plaintiff has demonstrated such a substantial nexus, the motion should be denied. Ibid. The court should then instruct the jury to determine whether the plaintiff believed that the defendant's conduct was incompatible with a "clear mandate of

26

public policy," and if so, whether such a belief was reasonable. Ibid. If the plaintiff fails to demonstrate a substantial nexus between the employer's conduct and the identified clear mandate of public policy, the trial court should grant the motion and dismiss the N.J.S.A. 34:19-3(c)(3) claim.

The statutory elements and the analytical framework set forth in Dzwonar distinguish an employee's objection to, or reporting of, an employer's illegal or unethical conduct from a routine dispute in the workplace regarding the relative merits of internal policies and procedures. See Dzwonar, supra, 177 N.J. at 467-69 (affirming dismissal of plaintiff's CEPA claim based upon general administration of union meetings and union's allegedly inadequate explanation of its actions to membership); Maw, supra, 179 N.J. at 443, 445 (rejecting employee's CEPA claim where employee "was terminated for refusing to execute an employment agreement containing a do-not-compete provision" and stating that "the dispute between the employer and employee must be more than a private disagreement"); Schechter v. N.J. Dep't of Law & Pub. Safety, Div. of Gaming Enforcement, 327 N.J. Super. 428, 432 (App. Div. 2000) (rejecting CEPA claim premised upon "nothing more than a policy dispute between the Division's middle and upper level management concerning the priority to be assigned to exclusion cases"). As this Court observed in Estate of Roach, supra, when noting the importance of the plaintiff's

reasonable belief that the defendant's conduct contravened an authority recognized in CEPA:

> [I]f an employee were to complain about a co-employee who takes an extended lunch break or makes a personal telephone call to a spouse or friend, we would be hard pressed to conclude that the complaining employee could have "reasonably believed" that such minor infractions represented unlawful conduct as contemplated by CEPA. CEPA is intended to protect those employees whose disclosures fall sensibly within the statute; it is not intended to spawn litigation concerning the most trivial or benign employee complaints.
>
> [164 N.J. at 613-14.]

Accordingly, a pivotal component of a CEPA claim is the plaintiff's identification of authority in one or more of the categories enumerated in the statute that bears a substantial nexus to his or her claim. As the Court noted in Dzwonar, supra, in which it rejected the plaintiff's contention that union bylaws constituted a law, rule, regulation, or clear mandate of public policy for purposes of N.J.S.A. 34:19-3(c), "[t]he trial court can and should enter judgment for a defendant when no such law or policy is forthcoming." 177 N.J. at 463. Whether a CEPA plaintiff invokes a law, rule, regulation, declaratory ruling, or professional code of ethics as a benchmark for "improper quality of patient care" under N.J.S.A. 34:19-3(a)(1) or (c)(1), or alleges employer conduct "incompatible with a clear mandate of public policy concerning

28

the public health" under N.J.S.A. 34:19-3(c)(3), the plaintiff must identify the authority that provides a standard against which the conduct of the defendant may be measured.

By their express terms, and as construed by our courts, the relevant provisions of CEPA recognize a range of standards that may support a claim. For purposes of N.J.S.A. 34:19-3(a)(1) and (c)(1), the Legislature specifically enumerated the categories of authority that may establish the "improper quality of patient care." N.J.S.A. 34:19-2(f) defines "improper quality of patient care" to be a violation of "any law, or any rule, regulation or declaratory ruling adopted pursuant to law or professional code of ethics." N.J.S.A. 34:19-2(f).

As an Appellate Division panel has noted, CEPA is not intended to protect an employee "who simply disagrees with the manner in which the hospital is operating one of its medical departments, provided the operation is in accordance with lawful and ethical mandates." Klein, supra, 377 N.J. Super. at 42. Thus, a claim under N.J.S.A. 34:19-3(a)(1) or (c)(1) cannot proceed unless the plaintiff demonstrates a reasonable belief that the defendant's patient care is "improper," measured against an authority recognized by CEPA. Therefore, to assert a CEPA claim based on the "improper quality of patient care," the plaintiff must identify a law, rule, regulation, declaratory ruling adopted pursuant to law or professional code of ethics

29

that applies to and governs the employer in its delivery of patient care.

Plaintiff's second claim, based on a "clear mandate of public policy concerning the public health" under N.J.S.A. 34:19-3(c)(3), similarly requires a plaintiff employee to identify a source of law or other authority, constituting an expression of public policy, that sets a governing standard for the defendant employer's conduct. As the Court has observed, a "clear mandate" of public policy need not be enacted in a constitution, statute or rule, but must nonetheless provide a definite standard by which the employer's conduct may be gauged:

> Like [N.J.S.A. 34:19-3(c)(1)], the reference in [N.J.S.A. 34:19-3(c)(3)] to "a clear mandate of public policy" conveys a legislative preference for a readily discernible course of action that is recognized to be in the public interest. A "clear mandate" of public policy suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that, under [N.J.S.A. 34:19-3(c)(3)], there should be a high degree of public certitude in respect of acceptable vers[u]s unacceptable conduct.

> [Maw, supra, 179 N.J. at 444.]

As the Court noted in Mehlman, supra, the mandate of public policy must be "'clearly identified and firmly grounded'" and cannot be "'vague, controversial, unsettled [or] otherwise problematic.'" 153 N.J. at 181 (quoting MacDougall v. Weichert, 144 N.J. 380, 391-92 (1996)).

30

Consistent with this principle, our courts have recognized various sources of authority bearing the required substantial nexus to the plaintiff's claim. In each case, the law, regulation, or other authority held to support a CEPA claim, not only expressed a "clear mandate of public policy," but identified acceptable and unacceptable practices in the defendant employer's business. In Mehlman, supra, the Court found, based on several sources of law and regulation that were admitted into evidence at trial, a "clear mandate of public policy" governing the concentration of benzene in the defendant employer's gasoline. 153 N.J. at 190-92.[8] In Abbamont, supra, the plaintiff, a teacher of industrial arts, identified administrative regulations prescribing school metal shop safety requirements as the source of his complaints to management. Abbamont, supra, 138 N.J. at 410, 424. The plaintiff in Maimone, supra, a police officer, premised his "clear mandate of public policy" claim under N.J.S.A. 34:19-3(c)(3) upon laws against prostitution and against sexually-oriented businesses near churches and schools, which he alleged were ignored by his employer. 188 N.J. at 229, 232. In each of these settings, the

---

[8] These included United States and Japanese gasoline regulations that addressed benzene safety hazards, a Japanese Petroleum Associates guideline banning the sale of gasoline with a high concentration of benzene, a United States Occupational Safety and Health Administration regulation regarding benzene exposure, and the New Jersey product liability laws. See Mehlman, supra, 153 N.J. at 174-77.

authority expressed a "clear mandate of public policy" and generated a standard governing the employer's conduct. In the absence of such a relevant standard, this Court has not recognized a "clear mandate of public policy" bearing the required "substantial nexus" to the plaintiff's CEPA claim.[9]

Thus, to present a cognizable retaliation claim based on "improper quality of patient care" under N.J.S.A. 34:19-3(a)(1) and (c)(1), or based on practices "incompatible with a clear mandate of public policy concerning the public health" under N.J.S.A. 34:19-3(c)(3), a plaintiff must present authority meeting the statutory criteria that serves as a standard for the

---

[9] In Kalman v. Grand Union Co., a pre-CEPA case upon which plaintiff relies, an Appellate Division panel reversed a trial court's dismissal of a claim brought by a retail pharmacist terminated after he alleged that the pharmacy in which he worked illegally closed while the grocery store in which it stood remained open, leaving prescription drugs available to the public without a pharmacist present. 183 N.J. Super. 153, 155-56, 159 (App. Div. 1982). The plaintiff in Kalman cited several forms of authority in support of his common-law whistleblower claim: state statutes and state regulations governing the operation of pharmacies, and the American Pharmaceutical Association's Code of Ethics. Id. at 157-58. The pharmacists' Code of Ethics, governing both the plaintiff and his employer, required pharmacists to "observe the law" and to expose illegal or unethical conduct in the profession. Id. at 158. The Appellate Division concluded that the pharmacists' Code of Ethics supported state statutory and regulatory mandates and, in conjunction with those mandates, constituted an expression of public policy. Id. at 159. Kalman does not support plaintiff's contention that a code of ethics that compels the employee to report illegal activity, but imposes no requirements on the employer, can independently constitute a "clear mandate of public policy" under N.J.S.A. 34:19-3(c)(3).

32

employer's conduct.  In the absence of such authority, the CEPA claim fails.

V.

In light of the statutory text and the framework of our case law, we consider the three sources upon which plaintiff relied in support of his CEPA claims.

Section 3.5 of the ANA Code, entitled "Acting on questionable practice," addresses the obligation of a nurse to report inadequate medical care.  It provides:

> The nurse's primary commitment is to the health, well-being, and safety of the patient across the life span and in all settings in which health care needs are addressed.  As an advocate for the patient, the nurse must be alert to and take appropriate action regarding any instances of incompetent, unethical, illegal, or impaired practice by any member of the health care team or the health care system or any action on the part of others that places the rights or best interests of the patient in jeopardy.  To function effectively in this role, nurses must be knowledgeable about the Code of Ethics, standards of practice of the profession, relevant federal, state and local laws and regulations, and the employing organization's policies and procedures.
>
> When the nurse is aware of inappropriate or questionable practice in the provision or denial of health care, concern should be expressed to the person carrying out the questionable practice.  Attention should be called to the possible detrimental [e]ffect upon the patient's well-being or best interests as well as the integrity of nursing practice.  When factors in the

33

health care delivery system or health care organization threaten the welfare of the patient, similar action should be directed to the responsible administrator. If indicated, the problem should be reported to an appropriate higher authority within the institution or agency, or to an appropriate external authority.

The ANA Code provision also addresses the importance of "established processes for reporting and handling incompetent, unethical, illegal, or impaired practice" in the employment setting to reduce the risk of reprisal. It provides that a nurse reporting such improper practice should be assisted by nursing colleagues, state nursing associations, and "appropriate authorities" such as practice committees of professional organizations, licensing authorities, and regulatory agencies concerned with evaluating standards of practice. The section concludes by noting that "[a]ccurate reporting and factual documentation, and not merely opinion, undergird all such responsible actions," and that professional risks resulting from reporting "do not eliminate the obligation to address serious threats to patient safety."

We concur with the Appellate Division panel that the ANA Code does not constitute a source of law or other authority bearing a "substantial nexus" to Bridgeway's conduct, as Dzwonar mandates. Dzwonar, supra, 177 N.J. at 464. The ANA Code expresses the nursing profession's commitment to sound patient

34

care, and like CEPA it encourages reporting of deficient practice to appropriate authorities. As plaintiff necessarily conceded at trial, however, the ANA Code does not govern Bridgeway's patient care. The ANA Code includes no general standard for infection control in a nursing home, much less specific direction on how Bridgeway should have treated its patients' illnesses in January 2008. It provides no standard under which a factfinder could determine whether plaintiff held an objectively reasonable belief that Bridgeway delivered an "improper quality of patient care." N.J.S.A. 34:19-3(a)(1); N.J.S.A. 34:19-3(c)(1). Nor does the ANA Code prescribe for Bridgeway a "readily discernible course of action that is recognized to be in the public interest," from which we can discern a "clear mandate of public policy." N.J.S.A. 34:19-3(c)(3); Maw, supra, 179 N.J. at 444; see also Warthen v. Toms River Cmty. Mem'l Hosp., 199 N.J. Super. 18, 20-21, 28 (App. Div.) (finding that "even if [the court] were to make the dubious assumption that the [ANA Code] represents a clear expression of public policy," plaintiff's personal morals, not mandate of public policy, were source of her objection to conducting kidney dialysis on terminally ill patient), certif. denied, 101 N.J. 255 (1985). The Code directs a nurse's action in response to deficient patient care in a nursing home, but provides no standard by which such a deficiency can be

35

ascertained.  Accordingly, it does not support either of plaintiff's CEPA claims.

As the Appellate Division panel found, the second authority cited by plaintiff, the Bridgeway Employee Handbook's Code of Conduct, similarly falls short of the mark.  The Code of Conduct states that Bridgeway has "adopted a Compliance Program to ensure that [it] operates in full compliance with applicable State and Federal statutes and regulations, including health care programs and private insurance program requirements," and states that "[i]t establishes the basic legal and fundamental principles . . . that Bridgeway will operate under."  The Code of Conduct sets forth ethical standards for Bridgeway staff, prescribes employee compliance with laws and regulations, sets forth reporting procedures and states that patients will be afforded "service[s] that are identified as needed."  The Code of Conduct does not, however, provide a governing standard for Bridgeway's response to infectious diseases in patients, or otherwise define an adequate response to any condition or disease.

Moreover, the Code of Conduct articulates no public policy with respect to the control of infectious disease.  In contrast to the guide at issue in Abbamont, supra, 138 N.J. at 424, which specifically incorporated administrative regulations addressing safety, the Bridgeway Employee Handbook sets forth no authority

36

which could be construed as an expression of public policy regarding infection control. The Code of Conduct does not constitute authority on which a plaintiff could premise a claim under N.J.S.A. 34:19-3(a)(1) and (c)(1) for the "improper quality of patient care," or a claim under N.J.S.A. 34:19-3(c)(3) asserting retaliation for objecting to conduct incompatible with a "clear mandate of public policy."

Finally, plaintiff relies on the Bridgeway Statement of Resident Rights.[10] As plaintiff described it at trial, the Statement of Resident Rights ensures that a Bridgeway patient has rights, including the freedom to choose his or her physician, to choose and participate in his or her care, and to be shielded from social isolation. Again, the source of authority cited by plaintiff has no relationship to the subject of his complaints -- allegedly deficient control of infection in staff and residents in January 2008. It provides no standard for "improper quality of patient care" for purposes of N.J.S.A. 34:19-3(a)(1) and (c)(1). Further, like the Employee Handbook, the Statement of Resident Rights articulates no "clear mandate

---

[10] The Bridgeway Statement of Resident Rights is not part of the record. The record includes only plaintiff's acknowledgement that he had reviewed the Statement of Resident Rights. In his acknowledgement, plaintiff verified that he understood each right, that he agreed "to promote and protect the rights of each resident," and that he committed "to treat each resident with kindness, dignity and respect and to report any instances of abuse, neglect and/or mistreatment of residents" to his supervisor, without delay.

of public policy" as required by N.J.S.A. 34:19-3(c)(3).  In sum, plaintiff identified no law, rule, regulation, declaratory ruling adopted pursuant to law, professional code of ethics, or other authority recognized by CEPA, that presented a standard for Bridgeway's delivery of patient care.

Our dissenting colleague contends that Bridgeway's motion for an involuntary dismissal under Rule 4:37-2(b) should have been denied.  Post at ___ (slip op. at 14).  He reasons that because the trial court cited CDC guidelines when it denied a pretrial motion for summary judgment, and by virtue of references in plaintiff's testimony to "standard precautions" recommended by the CDC, the trial court properly denied Bridgeway's motion.  Post at ___ (slip op. at 10-13).  Neither the trial court's prior references to CDC standards in its summary judgment decision, nor plaintiff's vague references to CDC-recommended precautions in his testimony, provide what CEPA demands: evidence of a law, rule, regulation, declaratory ruling, professional code of ethics, or clear mandate of public policy that bears a substantial nexus to plaintiff's claim. Dzwonar, supra, 177 N.J. at 464.

Contrary to the suggestion of our dissenting colleague, the trial court's citation to CDC guidelines to buttress its decision, in a pretrial summary judgment motion, is no substitute for evidence of a governing standard admitted for the

38

jury's consideration at trial.  By its very terms, Rule 4:37-2(b) limits the trial court to the evidence in, and inferences that may be drawn from, the trial record.  R. 4:37-2(b); see also Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995) (explaining that, unlike summary judgment motions, motions to dismiss under Rule 4:37-2(b) "are based on evidence presented during . . . trial").  The inquiry is not whether factual assertions and legal arguments could have been made by the trial court or counsel to support the plaintiff's claim, but whether the plaintiff has presented at trial evidence that "together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor."  R. 4:37-2(b); see Pressler, Current N.J. Court Rules, comment 2 on R. 4:37-2; Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008); Polyard v. Terry, 160 N.J. Super. 497, 505 (App. Div. 1978), aff'd, 79 N.J. 547 (1979).  Nothing in that rule -- or in our practice -- authorizes a trial court to incorporate by reference part of its summary judgment opinion, or any other source extraneous to the trial record, as a basis to deny a motion for involuntary dismissal at the close of the plaintiff's proofs.  The trial court's reference to CDC guidelines in its summary judgment decision simply cannot serve, after the fact, as a proxy for trial evidence.

The proofs that can be found in the record fell far short of the mark set by CEPA, as construed in Dzownar.  None of the three sources of authority that plaintiff elected to rely upon in his presentation of evidence and his proposed instructions to the jury -- the ANA Code and the two Bridgeway documents -- consisted of a CDC guideline or state law standard.  During his cross-examination, plaintiff briefly alluded to, but did not identify, "standard precautions" involving hand-washing, the use of gloves, and "other barriers," emanating from the CDC and "State policies[] from the health department."  As the dissent notes, among the numerous recommendations published by the CDC, there is an infection control guideline entitled Healthcare Infection Control Practices Advisory Committee, 2007 Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings, available at http://www.cdc.gov/hicpac/pdf/isolation/Isolation2007.pdf.  HSS also has enacted regulations governing infection control in hospitals and nursing homes, including N.J.A.C. 8:39-19.4.  See also N.J.S.A. 26:2H-93 (finding that "[i]t is in the public interest of [New Jersey] for its nursing home industry to continue to provide high-quality services to those frail and vulnerable citizens who critically need nursing home care").  The record does not indicate whether these were the sources to which plaintiff generally referred; at trial, he revealed

40

neither the name nor the contents of the CDC guidelines and state policies, and offered no document constituting or relating to such guidelines and policies into evidence. Moreover, in omitting any CDC guideline or state regulation from his pretrial proposed instructions to the jury -- a position from which he never diverged at trial -- plaintiff affirmatively elected not to rely on these sources as the authority required to support his CEPA claims.

Contrary to our dissenting colleague's contentions, the trial record is devoid of proof that would put the defendant on notice of any CDC or state regulatory standard against which its conduct was to be assessed, or enable the trial judge, the jury, or an appellate court to evaluate plaintiff's claims against the statutory benchmark.[11] In short, plaintiff did not identify,

---

[11] The excerpts from the record set forth by our dissenting colleague confirm that plaintiff presented no specific CDC standards or other policies that would provide a benchmark for the jury. In the first selection from plaintiff's testimony cited by the dissent, post at ___ (slip op. at 4-5), plaintiff did nothing more than to note the existence of unidentified "CDC policies on infection control" in which the use of masks was recommended. In the second excerpt cited by our dissenting colleague, post at ___ (slip op. at 5-6), plaintiff simply recounted his instructions to staff, with no mention of any CDC guideline or any other standard. The third excerpt cited in the dissent, post at ___ (slip op. at 6), involved plaintiff's discussion of a supervisor's job duties, and similarly failed to identify any CDC or other infection control standard. While our dissenting colleague has identified specific "standard precautions" promulgated by the CDC, post at ___ (slip op. at 7-9), and has explained them in detail, no such effort was undertaken by plaintiff at trial.

41

offer into evidence, or cite in his proposed jury instructions any federal or state regulatory "standard precautions" for infection control.

As a matter of law, plaintiff failed to present evidence to support a substantial nexus between the complained-of conduct and an authority cognizable under N.J.S.A. 34:19-3(a)(1), (c)(1) or (c)(3). Viewing the record in plaintiff's favor as required by Rule 4:37-2(b), the trial court should have granted Bridgeway's motion for an involuntary dismissal at the close of plaintiff's case. Accordingly, the Appellate Division panel properly reversed the liability verdict in plaintiff's favor.

In light of our holding, we do not reach the plaintiff's argument that the jury returned an inconsistent verdict requiring a new trial on the issue of damages, or that he is entitled to an additur in light of that verdict.

VI.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICE LaVECCHIA, and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned), join in JUSTICE PATTERSON's opinion. JUSTICE ALBIN filed a separate, dissenting opinion.

42

JAMES HITESMAN,

    Plaintiff-Appellant,

       v.

BRIDGEWAY, INC., d/b/a
BRIDGEWAY CARE CENTER,

    Defendant-Respondent.


    JUSTICE ALBIN, dissenting.

    Plaintiff James Hitesman, a registered nurse, claimed defendant Bridgeway Care Center terminated his employment because he complained to his supervisors and governmental authorities about the nursing home's failure to take standard precautions to address an incipient, life-threatening outbreak of infection among the facility's elderly patients and staff. Hitesman contended that Bridgeway's retaliatory firing for his whistleblowing activities violated the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -8.

    In denying Bridgeway's motion for an involuntary dismissal at the end of Hitesman's case, the trial court did exactly what is asked of all courts deciding such motions -- it looked at the evidence in the light most favorable to the non-moving party, Hitesman. Based on that standard, the court concluded that Hitesman established the elements of a cause of action under

1

CEPA.  The court found evidence to support the conclusion that Hitesman reasonably believed that Bridgeway was violating laws and regulations governing the proper quality of patient care, that he reported Bridgeway's violations to the appropriate authorities, and that he was fired for doing so.

The majority has simply ignored the record in overturning the trial court's decision.  The record clearly reveals that Hitesman testified about violations of "standard precautions" concerning infection control reflected in federal and state healthcare law and that the trial court relied on his testimony and those sources of law in denying Bridgeway's motion to dismiss.  The majority's assertion that Hitesman was merely expressing his personal views on the proper quality of patient care is not borne out by the record -- and certainly not by a reading of the record that gives Hitesman the benefit of all favorable inferences.

I therefore respectfully dissent.  In doing so, I will turn to those portions of the record either omitted or barely mentioned in the majority's opinion.  I will let the record speak for itself.

I.

To support a CEPA claim under N.J.S.A. 34:19-3(a), (c)(1), or (c)(3), plaintiff must establish that he reasonably believed

2

an activity, policy, or practice of his employer constituted improper quality of patient care, contrary to law or a clear mandate of public policy, and that his employer fired him for his whistleblowing. The plaintiff does not have to show that his employer "actually violated the law or a clear mandate of public policy." Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003). So long as a plaintiff has an objectively reasonable belief that his employer has done so, the plaintiff is protected even if he is mistaken. Id. at 464. CEPA's intent "is not to make lawyers out of conscientious employees" who report conduct "that they reasonably believe to be unlawful." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94 (1998). Rather, CEPA's intent is to prevent retaliation against employees who make good-faith objections. Ibid.

## II.

### A.

The majority asserts that Hitesman's trial testimony only "briefly alluded to, but did not identify, 'standard precautions'" deriving from federal and state law. Ante at ___ (slip op. at 40). The record says otherwise.

Hitesman testified that, as a nurse, he was obliged "to protect the patients" in the Bridgeway facility and to ensure that "quality of care" standards were followed, particularly

3

those standards related to "infection control."  He was alarmed about an outbreak of respiratory and gastrointestinal infections within the facility and about Bridgeway's failure to implement "standard precautions" to control the spread of those infections.  For example, Bridgeway officials did not take basic steps to isolate infected residents, such as closing the communal dining hall.  As Hitesman explained, "[p]utting all these people together to possibly contaminate each other . . . posed a risk."

In his testimony, Hitesman unmistakably identified the Centers for Disease Control and Prevention (CDC) and state law as sources for his reference to "standard precautions."  Here is what Hitesman said in response to questioning:

> Q.  And these standard precautions come from where?
>
> A.  They come from the CDC.  And State policies, from the health department. . . .
>
> Q.  What CDC policies?
>
> A.  CDC policies on infection control.
>
> Q.  For what in?  They have different --
>
> A.  Well, they have . . . the general policies for infection control which are called standard precautions.
>
> Q.  Okay.

4

And tell me in what instance are you suppose to use masks under the infection control from the CDC?

A. When you have evidence of some type of -- some type of illness that is being spread through other vectors. In the case of a mask you are looking at airborne mode of transportation, droplets, aerosol, that kind of thing.

Hitesman repeatedly explained the nature of the "standard precautions" for infection control:

Q. [Y]ou said before that you . . . closed the main dining room and you gave masks for the staff.

Is that correct?

A. Correct.

Q. Did you do anything else with the staff to act on your concerns?

A. I reminded them of basic standard precautions, washing hands, infection controls, whatever barriers you might need depending upon what the symptoms were that were presented. . . .

Q. What infection control procedure did you go over with the staff?

A. Well. Pardon me. The basic -- basic standards are standard precautions. You always assume a patient is infected even when there is no infection. It tells you when to wash your hands, use gloves. You wash your hands before and after dealing with the residents. After toileting a resident, cleaning a resident up. When to use gloves. When not to use gloves. That kind of thing.

5

And then we went over more advanced techniques.

If patients were showing symptoms of lots of vomiting and diarrhea, GI symptoms, then they might require gowns. If they were dealing with a patient that was sneezing and coughing a lot, it might require gloves, maybe even goggles, depending on what was going on.

In discussing the responsibilities of the Bridgeway infection control coordinator, Hitesman again referenced the CDC "standard precautions":

Q. What [were] the duties of the infection control coordinator?

A. Her duties would have been to educate the staff on basic infection control standard precautions as laid out by the CDC, as well as advanced techniques for infection control for patients that required isolation.

[(Emphasis added).]

Additionally, Hitesman testified that during the course of the outbreak at the Bridgeway facility, he gave Director of Nursing Frances Gerber, a registered nurse, an article from the CDC on influenza. The article "addressed droplets and airborne viruses and procedures on how to prevent airborne infections." Although Hitesman was not specifically concerned about a flu outbreak, he believed that the CDC article "was just an example of how to control infection."

6

Despite Hitesman's testimony, the majority insists that "he revealed neither the name nor the contents of the CDC guidelines and state policies, and offered no document constituting or relating to such guidelines and policies into evidence." Ante at ___ (slip op. at 40-41). Hitesman's testimony, however, sufficiently identified the relevant CDC guidelines applicable to Bridgeway as a healthcare facility. CEPA does not require that a plaintiff in his testimony give the precise statutory citation of the law that he reasonably believes his employer is violating. Indeed, the law or public policy that plaintiff reasonably believes his employer is violating may be "identified by the court or the plaintiff." Dzwonar, supra, 177 N.J. at 464.

The majority cites no legal authority for the new demands it places on CEPA plaintiffs. Until today, "[t]he object of CEPA [was] not to make lawyers out of conscientious employees." Mehlman, supra, 153 N.J. at 193. Until today, no case required a plaintiff to make a hard copy of a federal or state statute or regulation, such as the CDC guidelines, and place or read it into evidence. Here, the court referred to and quoted the applicable law in its summary-judgment opinion, which was incorporated in the court's involuntary-dismissal decision.

B.

7

The CDC "standard precautions" identified and described by Hitesman are a set of instructions for infection control in healthcare facilities.  See Healthcare Infection Control Practices Advisory Committee, 2007 Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings 66 (2007) [hereinafter Guideline for Isolation Precautions], available at http://www.cdc.gov/hicpac/pdf/isolation/Isolation2007.pdf.  The standard precautions are

> a group of infection prevention practices that apply to all patients, regardless of suspected or confirmed infection status, in any setting in which healthcare is delivered . . . .  These include:  hand hygiene; use of gloves, gown, mask, eye protection, or face shield, depending on the anticipated exposure; and safe injection practices.  Also, equipment or items in the patient environment likely to have been contaminated with infectious body fluids must be handled in a manner to prevent transmission of infectious agents.

> [Ibid.]

The standard precautions are regarded by the CDC as "the primary strategy for the prevention of healthcare-associated transmission of infectious agents among patients and healthcare personnel."  Ibid. (emphasis omitted).  How the standard precautions apply in any given case is determined by the nature of the healthcare interactions "and the extent of anticipated blood, body fluid, or pathogen exposure.  For some interactions

8

. . . only gloves may be needed; during other interactions . . . use of gloves, gown, and face shield or mask and goggles is necessary." Ibid.

In his testimony, Hitesman expressed an understanding of these "standard precautions" promulgated by the CDC. Hitesman specifically pointed out that the infection control policies governing New Jersey nursing-home facilities are also derived from state law. Significantly, the CDC Guideline for Isolation Precautions is explicitly incorporated into state law. N.J.A.C. 8:39-19.4(a) mandates that a long-term healthcare "facility shall develop, implement, comply with, and review . . . written policies and procedures regarding infection prevention and control which are consistent with the most up-to-date Centers for Disease Control and Prevention publications, incorporated herein by reference, including, but not limited to . . . Guidelines for Isolation Precautions in Hospitals." (Emphasis added). Similarly, the CDC standard precautions are contained in guidelines developed by the New Jersey Department of Health and Senior Services, specifically the Guidelines for the Control of Respiratory Outbreaks in Long-Term Care and Other Institutional Settings 6-10 (Nov. 2011),[1] and the Guidelines for

---

[1] Available at http://www.state.nj.us/health/flu/documents/outbreak_prevention.pdf.

the Control of Gastroenteritis Outbreaks in Long-Term Care and Other Institutional Settings 5-8 (Nov. 2011).[2] Both of these sources also reference the CDC Guideline for Isolation Precautions.

The testimony quoted above belies the majority's assertion that Hitesman failed to identify, or "briefly alluded to," the CDC "standard precautions" as a source of law. Moreover, the majority's constrained and ungenerous reading of the record is completely at odds with the standard to be applied at a motion to dismiss, a standard that gives Hitesman the benefit of the most favorable inferences from his testimony.

III.

A.

Without any support, the majority states that "the trial record is devoid of proof that would put the defendant on notice of any CDC or state regulatory standard against which its conduct was to be assessed." Ante at ___ (slip op. at 41). A nursing home facility, like Bridgeway, is presumed to know the law governing the control of infectious diseases, and once an applicable statute or regulation is brought to its attention, it should have no problem accessing the law online or in a library.

_____

[2] Available at http://www.state.nj.us/health/cd/manual/gi_ltc.pdf.

10

At the summary-judgment stage, the trial court identified and quoted the above federal and state sources of law on infection control.  It thus "identif[ied] a statute, regulation, rule, or public policy that closely relates to the complained-of conduct."  See Dzwonar, supra, 177 N.J. at 463.  And, it made "a threshold determination that there [was] a substantial nexus between the complained-of conduct and a law or public policy."  See id. at 464.  The trial court made the "substantial nexus" decision in favor of Hitesman and memorialized this decision in a thorough and detailed written summary-judgment opinion.

In that opinion, the court identified the sources of law and public policy concerning Hitesman's "improper quality of patient care" allegations under N.J.S.A. 34:19-3(a)(1) and (c)(1), and his "clear mandate of public policy" allegations under N.J.S.A. 34:19-3(c)(3).  It cited Section 3.5 of the American Nursing Association (ANA) Code of Ethics, as well as "myriad statutes and regulations applicable to [Bridgeway]'s standard of care."  These regulations included all of the sources identified above, particularly the CDC Guideline for Isolation Precautions, N.J.A.C. 8:39-19.4 (mandating "general policies and procedures for infection control," including compliance with CDC guidelines in long-term care facilities), and the Department of Health and Senior Services guidelines on

11

infection control.[3]  The trial court specifically noted that Hitesman brought to its attention the Health and Senior Services guidelines.

After Hitesman presented his case, Bridgeway challenged both the trial court's "substantial nexus" determination and the sufficiency of the trial evidence in a motion for involuntary dismissal.  Addressing the "substantial nexus" issue, the court explained that it would not revisit its earlier summary-judgment opinion in which it identified the applicable sources of law. The court observed that the parties "had extensive argument on the summary judgment motions as to the law that applies to this case" and that "it was [the court's] responsibility to identify what law may apply."  Indeed, the court specifically expressed that it had "established what the laws/policies/regulations are."

Then, the trial court gave its reasons for denying the involuntary-dismissal motion.  The court acknowledged that defendant believed that the evidence was "weighted substantially in [their] favor."  However, the court maintained that in

_____

[3] The trial court also referenced N.J.S.A. 26:2H-93 (declaring that "[i]t is in the public interest of this State for its nursing home industry to continue to provide high-quality services to those frail and vulnerable citizens who critically need nursing home care"), and 42 C.F.R. § 483.25 ("Each resident must receive and the facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being . . . .").

12

deciding the motion it was not to assess whether "the weight" of the evidence favored defendant but rather whether there was "any evidence that could go to the jury." The court noted that "we've heard the testimony of the plaintiff."

### B.

The trial court clearly understood its obligations under CEPA and Rule 4:37-2(b) at the involuntary-dismissal stage. See Dzwonar, supra, 177 N.J. at 464 ("If the trial court . . . finds [a substantial nexus], the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable."). The court did nothing more remarkable than apply the standard governing a dismissal motion, assessing the evidence and the legitimate inferences drawn from the record in allowing the case to go to the jury.

Nevertheless, with blinders on, the majority refuses to accept the permissive standard that applies in a motion for involuntary dismissal. The majority pretends that Hitesman did not testify about the CDC standard precautions and that the only cited authorities present at the time of the involuntary-dismissal motion were the ANA Code of Ethics, Bridgeway's Employee Handbook, and Bridgeway's Statement of Resident Rights. Again, the record says otherwise.

### C.

In addressing the merits of whether the trial court properly denied defendant's involuntary-dismissal motion, the majority posits that Hitesman's proposed jury instructions were inadequate because they failed to cite the CDC guidelines on "standard precautions" for infection control. See ante at ___ (slip op. at 41-42). However, whether jury instructions are adequate is a completely separate issue from whether a motion to dismiss should be granted. The trial court understood this distinction, and said so. In denying the dismissal motion, the court referenced the applicable law that it detailed in its summary-judgment opinion -- the CDC guidelines and state law incorporating those guidelines. Any inadequacy in the jury charge is a matter that should have been separately addressed.

In summary, the trial court followed the framework articulated in Dzwonar, supra, 177 N.J. at 464, and correctly applied Rule 4:37-2(b) to the trial record. I fail to see how the majority can conclude that Hitesman's CEPA claims should have been dismissed.

IV.

Additionally, I disagree with the majority's supposition that the ANA Code of Ethics has no applicability to Bridgeway as a healthcare facility. See ante at ___ (slip op. at 35). Inasmuch as Bridgeway acts through its employees, some of whom

14

are nurses, the ANA Code of Ethics has applicability to Bridgeway under CEPA.

The majority makes much of the point that Hitesman on cross-examination made a concession that the ANA Code of Ethics did not apply to Bridgeway. Ante at ___, ___ (slip op. at 12, 35). That a skilled defense attorney elicited from Hitesman an incorrect opinion on the law -- that the ANA Code of Ethics did not apply to Bridgeway -- does not alter the law.

An "employer" is defined broadly in CEPA to include "any individual, partnership, association, corporation or any person or group of persons acting directly or indirectly on behalf of or in the interest of an employer with the employer's consent." N.J.S.A. 34:19-2(a). Thus, "employer" encompasses any individuals working on behalf of Bridgeway, including nurses. The ANA Code of Ethics clearly applies to nurses, including Hitesman, who worked in the Bridgeway facility on Bridgeway's behalf. Surely, an employee who claims that other employees are violating their professional ethical mandates is engaged in activity protected by CEPA.

Therefore, the ANA Code of Ethics could reasonably form part of the basis for Hitesman's whistleblowing activity. If Hitesman reasonably believed that not reporting improper quality of patient care in the Bridgeway facility would be a violation of the ANA Code of Ethics, then Hitesman was engaged in

15

protected activity.  In the context of this case, however, the ANA Code of Ethics is only meaningful in light of the CDC "standard precautions" for infection control.

V.

In conclusion, looking at the record in the light most favorable to Hitesman, sufficient evidence was presented to overcome Bridgeway's motion to dismiss.  For that reason, there is no basis to reverse the trial court's decision to let this case go the jury.  Because the majority has failed to adhere to the deferential standard of review applicable to involuntary-dismissal motions, I respectfully dissent.

16

SUPREME COURT OF NEW JERSEY

NO.     A-73                    SEPTEMBER TERM 2012

ON CERTIFICATION TO        Appellate Division, Superior Court


JAMES HITESMAN,

      Plaintiff-Appellant,

            v.

BRIDGEWAY, INC., d/b/a
BRIDGEWAY CARE CENTER,

      Defendant-Respondent.


DECIDED             June 16, 2014
            Chief Justice Rabner              PRESIDING
OPINION BY              Justice Patterson
CONCURRING/DISSENTING OPINIONS BY
DISSENTING OPINION BY            Justice Albin


| CHECKLIST | AFFIRM | REVERSE |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 1 |