**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4003-15T2

JOSE COTTO,

     Plaintiff-Respondent,

v.

NEWARK PUBLIC SCHOOLS,

     Defendant-Appellant.

_____

           Argued October 25, 2018 – Decided March 7, 2019

           Before Judges Simonelli, O'Connor and Whipple.

           On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3932-10.

           Sandro Polledri argued the cause for appellant (Adams Gutierrez & Lattiboudere, attorneys; Sandro Polledri, of counsel and on the briefs).

           Silvia G. Gerges argued the cause for respondent (Lawrence & Gerges LLC, attorneys; Mark C.G. Lawrence, of counsel and on the brief).

PER CURIAM

In this employment matter, plaintiff Jose Cotto, a non-tenured teacher whose contract was not renewed, filed a complaint against defendant Newark Public Schools for wrongful termination under the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. A jury rendered a verdict in plaintiff's favor and awarded him damages. Defendant appeals from the April 4, 2012 order denying its motion for summary judgment, and challenges an evidentiary ruling.[1] We affirm.

---

[1] Defendant also appeals from the May 11, 2012 order denying its motion for reconsideration of the denial of summary judgment. However, defendant does not explain how the trial court's decision was palpably incorrect, irrational, or how the court failed to consider probative evidence. See Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010). Thus, we decline to consider this issue. In addition, although the notice of appeal indicates defendant appeals from the July 27, 2012 order denying its motion for remittitur, the January 15, 2016 order awarding plaintiff additional back and front pay, and the April 4, 2016 order awarding plaintiff attorney's fees and costs, defendant did not address these issues in its merits brief. Thus, the issues are deemed waived. See Heyert v. Taddese, 431 N.J. Super. 388, 437 (App. Div. 2013); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2019). Lastly, defendant appeals from the June 5, 2012 order denying it motion for involuntary dismissal, and the July 27, 2012 order denying its motion for judgment notwithstanding the verdict (JNOV). However, defendant does not specifically explain how the court erred in denying these motions and appears to rely on the arguments made in support of summary judgment. Thus, these issues are deemed waived as well.

A-4003-15T2

# I.

We derive the following facts from the evidence submitted by the parties in support of, and in opposition to, the summary judgment motion, viewed in the light most favorable to plaintiff, who opposed entry of summary judgment. Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 135 (2017).

Defendant employed plaintiff as a world language teacher for the 2008-2009 school year under a one-year contract. Plaintiff taught Spanish to third-through eighth-grade students at the Newton Street School.

The issues raised on appeal involve two distinct sets of facts. The first, which forms the basis of plaintiff's CEPA claims, concerns defendant's conduct relating to a threat by an eighth-grade special education student, J.O., to kill plaintiff. The second, which forms the basis for defendant's defense to plaintiff's CEPA claim, involves plaintiff's alleged struggle to meet requisite performance expectations for first-year novice teachers.

## The J.O. Incident

Plaintiff believed J.O. was gang-involved and that the school principal, James Carlo, had taken a special interest in J.O., since Carlo drove him to school and let him "hang out" in his office. Because J.O. had behavioral problems, an aide accompanied him to classes.

A-4003-15T2

On the morning of March 19, 2009, J.O. entered plaintiff's classroom and did not sit in his assigned seat. When plaintiff asked J.O. to move, J.O. replied, "Shut the fuck up before I pop you." Plaintiff asked J.O. what he meant, and J.O. replied, "Shut the fuck up before I kill you." While making this threat, J.O., who was approximately six feet tall, stood up and pointed a hairbrush at plaintiff "like a gun while miming pulling the trigger." At that point, either J.O. or another student, T.R., took out a cell phone, and J.O. said, "I'm calling my home boys right now so they can come and kick your ass." Plaintiff became "really scared" and told J.O.'s aide, Hannah Edwards, to escort J.O. and T.R. out of the classroom. Edwards took J.O. and T.R. to the office of the vice principal, Toni Bauknight. Carlo was at an off-campus meeting that day.

About five minutes later, Bauknight returned J.O. and T.R. to plaintiff's classroom. Plaintiff was shocked and exclaimed, "Why are you bringing them back to my class after they threatened my life?" With Bauknight still present, plaintiff left the classroom briefly to find his mentor, Ernest Whitaker, because he was afraid. Whitaker accompanied plaintiff back to his classroom, and plaintiff began teaching his lesson.

Singletary,[2] an aide not associated with J.O., arrived shortly thereafter to speak with plaintiff.  At that point, plaintiff left the classroom and "broke down in tears."  Singletary told plaintiff to call school security and the police because J.O.'s threat was very serious, and she gave plaintiff both phone numbers. Singletary's mother, a clerk who worked in the school office, ultimately called the police for plaintiff because plaintiff was too upset to make the call.

Newark Police Officer Day responded to the school and met with plaintiff and Bauknight.  Plaintiff told Day about J.O.'s threat, but Day said he could not make any arrests until he received a report from the school administration.  After Day left, plaintiff spoke with Bauknight about the incident for fifteen or twenty minutes.  Bauknight gave plaintiff a book entitled, "What Every Middle School Teacher Should Know" and released him for the day.  Plaintiff claimed Bauknight acknowledged to him that J.O. admitted having threatened to kill him.

Bauknight wrote in an incident report that J.O. and plaintiff had exchanged words that escalated to a verbal exchange after J.O. refused to change seats.  However, Bauknight did not describe exactly what J.O. said to plaintiff. She wrote that J.O. made a call on his cell phone, but provided no details about the nature of the call.

---

[2]  The record does not reveal Singletary's first name.

A-4003-15T2

Bauknight also wrote that when she returned J.O. to plaintiff's classroom, she overheard plaintiff say "he can't take it and . . . he can't teach like this and that he felt threatened and he was going to call the police." Bauknight wrote that she took J.O. to her office after plaintiff's class ended and allowed him to call his mother. During that phone call, Bauknight and J.O.'s mother agreed that J.O. would stay at school and not go home. However, Bauknight also wrote that J.O. was suspended for two days, but the record does not reveal when the suspension took effect. Finally, although the report confirmed that Bauknight spoke at length with plaintiff after Day left, it did not recount plaintiff's version of events.

At approximately 3:00 p.m. the next day, Carlo called plaintiff to his office, with Bauknight present. Plaintiff claimed that Carlo screamed at him, scolded him for calling the police, and told him he had put the children's life in jeopardy and acted very unprofessionally.[3] Plaintiff also claimed that Carlo never asked him about the incident with J.O. Instead, both Carlo and Bauknight gave plaintiff a disciplinary memo reprimanding him for conduct unbecoming a professional.

---

[3] The record does not reveal why Carlo accused plaintiff of endangering the children's lives.

A-4003-15T2

Carlo's disciplinary memo indirectly acknowledged the J.O. incident and focused upon events that allegedly occurred thereafter. The memo stated that on March 19, 2009, plaintiff: (1) yelled at the responding security guard, Pryor, after J.O. and T.R. had been escorted out of his classroom and slammed the door in her face; (2) threw J.O.'s book bag out of the classroom door, almost hitting the aide; (3) walked out of his classroom in the middle of the class period leaving Bauknight in the classroom; (4) called the director of security for the school district, Willie Freeman, to complain about Pryor, thus bypassing the school administrator; and (5) repeatedly used inappropriate language in front of his students. Notably, Bauknight's incident report did not state that plaintiff threw a book bag or used inappropriate language. However, the incident report stated that Bauknight spoke to Pryor about her interactions with plaintiff.

At any rate, Carlo's disciplinary memo concluded that plaintiff's conduct led to a complete loss of instructional time and compromised the safety of the students and the adults who responded to his classroom. The memo advised plaintiff it was his responsibility to maintain a safe and orderly learning environment in his classroom and security personnel are to be utilized for emergencies only. While the memo did not reference J.O. or T.R. specifically,

7

it stated, "the problematic students were out of the room on their own accord accompanied by the teacher['s] aide before security arrived."

Bauknight's disciplinary memo focused more on the J.O. incident. It stated that plaintiff failed to take the appropriate steps to deescalate the confrontation with the students, which resulted in the other students witnessing their teacher not displaying the appropriate standard of professional behavior, seeing their classmates disrespected, and hearing language inappropriate for a school setting. The memo further stated that plaintiff was directed to continue reading the book Bauknight gave him and meet with her to discuss the specific strategies he would implement in the classroom.

Plaintiff responded in writing to both disciplinary memos. He explained that J.O. had used extensive profanity and inappropriate language, called someone on his cell phone to arrange for plaintiff's assault, and plaintiff believed he was in grave danger of physical harm. Plaintiff stated he was in fear once Bauknight returned J.O. to his classroom because J.O.'s family was connected to a local street gang and could easily arrange his assault. He maintained that Bauknight's return of J.O. to his classroom placed both him and his students at risk of harm, and asserted that J.O.'s actions compromised the students' instructional time.

As to Pryor, plaintiff stated that he had not recognized her and slammed the classroom door only because it was "falling off the frame and require[d] excessive energy to close it." Plaintiff claimed that J.O. and T.R. kicked and broke the door before school began on March 16, 2009, three days prior to the J.O. incident, and Carlo failed to discipline them even though plaintiff reported their actions. Finally, plaintiff admitted calling Freeman, not to complain about Pryor, but because J.O.'s threats made him fear for his well-being.

<u>Defendant's Discipline Policy</u>

Plaintiff asserted that Bauknight's return of J.O. to his classroom after J.O. threatened him, and her failure to report the threat to the Newark Police Department (NPD), violated defendant's student discipline policy.[4]

The discipline policy outlines four levels of disciplinary infractions, ranging from Level I "misbehavior . . . which impedes orderly classroom procedures" to Level IV "acts which result in violence to another person or property or which pose a direct threat to the safety of others in the school."

---

[4] The record on appeal contains two versions of the district's discipline policy. One version was in effect prior to February 2009. The second version was approved by the district in February 2009, and revised on October 30, 2009. Plaintiff relied upon the latter version in his opposition to defendant's summary judgment motion; however, both versions were admitted into evidence at trial. The parties agree that the documents are substantially similar. To avoid confusion, we refer only to the latter version.

9

Within that framework, each level has its own procedures and disciplinary options or responses.

Threats can be Level III or Level IV infractions. For example, acts directed against persons or property, such as vandalism, graffiti, fighting, or threats to others, are considered Level III infractions. In response to a Level III infraction, administrators must "initiate[] disciplinary action by investigating . . . and conferring with staff on the extent of the consequences," which may include counseling and/or suspension.

Level IV infractions, the most serious, are "often criminal and are so serious that they may require . . . immediate removal of the student from school, the intervention of law enforcement authorities and action by central office administrators." For example, terroristic threats and the use of a cell phone to facilitate the commission of a crime or to inflict injury or harm to persons or property, are considered Level IV infractions.

The discipline policy requires administrators to verify the Level IV offense, confer with the staff involved, and meet with the student. Thereafter, the administrators must immediately remove the student from the school environment and notify the student's parents. If the infraction is a criminal offense, school officials must "contact [a] law enforcement agency and assist in

prosecuting [the] offender." Disciplinary options and responses to Level IV offenses include suspension and expulsion. With respect to threats in general, the discipline policy specifically requires the school principal, "in accordance with established procedures, [to] respond immediately to student, teacher and/or staff complaints of physical or verbal threats and/or incidents committed by other students, teachers, district[] employees or outside persons[.]"

The discipline policy also contains specific rules pertaining to the assault of teachers. Citing N.J.S.A. 2C:12-1, the discipline policy defines simple assault as conduct which: "(1) [a]ttempts to cause or purposely, knowingly, or recklessly causes bodily injury to another; or (2) [n]egligently causes bodily injury to another with a deadly weapon; or (3) [a]ttempts by physical menace to put another in fear of imminent serious bodily injury." Citing the statute, the discipline policy states that a person who commits a simple assault upon a teacher "clearly identifiable as being engaged in the performance of his duties" is guilty of a fourth-degree crime even if the teacher was uninjured.

The discipline policy characterizes "assault and battery" as a Level IV infraction. It further states that "any pupil who commits an assault (as defined by N.J.S.A. 2C:12-1) upon a board member, teacher, administrator or other employee of the Newark School District shall be immediately suspended from

11

school consistent with procedural due process. . . ." The discipline policy requires the principal to remove the student from class and keep the student under supervision until the end of the school day, or until the arrival of the student's parent or guardian.

Notably, and of significance here because J.O. was a special education student, the discipline policy states that students "with educational disabilities are subject to the same district disciplinary policies and procedures as non-disabled pupils, unless the pupil's Individualized Education Program [IEP] includes exemptions to those policies or procedures." J.O.'s IEP is not in the record.

In addition, defendant developed the "Uniform State Memorandum of Agreement Between Education and Law Enforcement Officials" (USM), revised in 2007, addressing the district's relationship with the NPD, as required by N.J.A.C. 6A:16-6.2(b)(13). The USM requires school officials to report genuine threats to the NPD:

> [S]chool official[s] shall immediately notify NPD whenever any school employee in the course of his or her employment develops reason to believe that anyone has threatened, is planning, or otherwise intends to cause death, serious bodily injury, or significant bodily injury to another person under circumstances in which a reasonable person would believe that the person genuinely intends at some time in the future to commit

the violent act or to carry out the threat, pursuant to N.J.A.C. 6A:16-6.3(c) through (e).

<u>The Alternate Route Teacher Program</u>

We now address the second relevant set of facts, which concerns plaintiff's teaching performance during the 2008-2009 school year. Plaintiff was employed with defendant through the alternate route, or provisional, teacher program. The one-year alternate route program allowed plaintiff to teach while holding a provisional certificate, with the option to obtain a standard certificate from the New Jersey Department of Education upon fulfilling all program requirements. Plaintiff had a Bachelor of Arts degree with a major in communications and a minor in education, but had not met the necessary requirements for a standard certificate. As a result, defendant was required to provide him with on-the-job training, support, and mentoring.

Carlo assigned Cora Noel to mentor plaintiff in September 2008, but soon after, plaintiff requested a new mentor because Noel's feedback was not helpful. Iraida Ramos began mentoring plaintiff in October 2008. During Ramos' three-month tenure as his mentor, plaintiff struggled with completing lesson plans. When Ramos stepped down as plaintiff's mentor, plaintiff asked Carlo to assign Whitaker as his mentor and plaintiff and Whitaker met weekly beginning in January 2009. Plaintiff praised Whitaker as a "great mentor" who taught him

how to do lesson plans in less than two weeks by showing him step by step what was required.

Plaintiff received additional support from Pilar Veru, the bilingual resource teacher coordinator. Although she was not assigned as plaintiff's mentor, Veru met with him once or twice a month, observed his teaching, and instructed him on classroom organization and management, and lesson planning. Veru also took plaintiff to observe an exemplary world languages class in another school. Veru provided plaintiff with much more support than the other world language teachers generally received, yet he continued to struggle with lesson presentation and classroom management.

Observations, Summative Evaluation,
and Non-Renewal of Plaintiff's Contract

During the 2008-2009 school year, N.J.S.A. 18A:27-3.1 required defendant to observe and evaluate the performance of non-tenured teachers, like plaintiff, "at least three times during each school year but not less than once during each semester" before April 30, 2009. Defendant's guidebook concerning the observation and evaluation process the statute mandated necessitated three formal observations at ten-week, twenty-week, and thirty-week intervals, to gather data about a teacher's practice, plus one annual written performance

14

evaluation, or summative statement incorporating the data gathered throughout the year.

The guidebook set target dates for those intervals of November 30, January 31, and March 16 for the observations, with the summative evaluation to be completed no later than April 16. The guidebook required the ten- and twenty-week observations be announced to the teacher and scheduled in advance by the observer. Although the thirty-week observation could be unannounced, the guidebook recommended that it be announced for the teacher's benefit. Observations were conducted during one fifty-minute class period.

The forms to memorialize each observation and summative evaluation are divided into four sections: (I) Curriculum, Instruction and Assessment; (II) Student Learning and Development; (III) Responsive Learning Environment; and (IV) School and Community. Those four sections are further sub-divided into twenty-eight component areas. Following each observation, the observer rated a provisional teacher's performance in each component area as beginning (B), emerging (E), or applying (A), with (B) being the least proficient and (A) being the most proficient.

For the annual summative evaluation, provisional teachers were given a designation of approved, insufficient, or disapproved for each section, along

with an overall evaluation. The summative ratings incorporated all the data collected during that year's observations. An overall "approved" designation guaranteed a recommendation for a standard teaching certificate. Although a provisional teacher rated as "insufficient" did not earn such a recommendation, he or she was not foreclosed from seeking "entry on one more occasion into a State-approved district training program" to try to obtain the recommendation. However, provisional teachers rated as "disapproved" were not given another chance.

Plaintiff's ten-week and twenty-week observations were announced and took place before the J.O. incident, while his thirty-week observation, which was unannounced, and his annual summative evaluation occurred shortly after the J.O. incident. The following chart summarizes the ratings plaintiff received in the aforementioned twenty-eight component areas, which we discuss in more detail below:

|  | Ten-week observation (by Carlo, 11/25/08) | Twenty-week observation (by Bauknight, 2/10/09) | Thirty-week observation (by Carlo, 3/27/09) |
|---|---|---|---|
| Beginning (B) | 13 | 19 | 24 |
| Emerging (E) | 13 | 9 | 2 |
| Applying (A) | 1 | 0 | 0 |
| N/A | 1 | 0 | 2 |

16

Carlo conducted plaintiff's ten-week observation on November 25, 2008. He gave plaintiff thirteen Bs, thirteen Es, and one A. Plaintiff received most of the Bs under Section I, Curriculum, Instruction and Assessment, and received the A under Section III, Responsive Learning Environment, for "[c]reating a positive classroom climate that is socially, emotionally and physically safe."

Carlo commended plaintiff for demonstrating high expectations for his students and their academic achievement, and for striving to develop positive relationships with all of the students in the school. He recommended that plaintiff develop a thorough understanding of core curriculum standards and instructional strategies to deliver effective instruction and create detailed lesson plans appropriate for the various grades he taught.

Bauknight conducted plaintiff's twenty-week observation on February 10, 2009. She gave plaintiff nineteen Bs, nine Es, and no As. Plaintiff received most of the Bs under Section I, Curriculum, Instruction and Assessment, and Section II, Student Learning and Development, and received the Es under Section III, Responsive Learning Environment, and Section IV, School and Community.

Bauknight's comments were positive overall, and largely consistent with Carlo's ten-week observation feedback. She commended plaintiff for

17

establishing a learning community that demonstrated "respect and rapport between teacher and student and student-to-student" and for his consistent and open communication with students' families. She recommended that plaintiff continue working closely with his mentor and supervisors on lesson planning. She further recommended that plaintiff create a classroom environment for his students that reflected academic rigor, a recommendation that Carlo had not made at the ten-week mark.

Plaintiff's thirty-week observation, conducted unannounced by Carlo, occurred on March 27, 2009, eight days after the J.O. incident. This time, plaintiff received his lowest ratings yet, with twenty-four Bs, two Es, and no As. Plaintiff received one E under Section I, Curriculum, Instruction and Assessment, and one E under Section IV, School and Community.

Despite the low scores, Carlo commended plaintiff for improvement with formatting his lesson plans and increasing communication with parents and guardians. Carlo's recommendations primarily concerned plaintiff's lesson presentation to students and his instructional strategies, a concern that Carlo had also highlighted during plaintiff's ten-week observation. Carlo emphasized that lessons must be rigorous, grade-appropriate, and include a variety of activities to meet the needs of students. Carlo remarked that student engagement was low

during the thirty-week observation, but could be improved by careful lesson planning and implementation. Notably, Bauknight's twenty-week observation comments did not criticize the level of student engagement she observed in February 2009, just one month earlier.

Three days later, on March 30, 2009, Carlo recommended the non-renewal of plaintiff's contract for the 2009-2010 school year. Among other things, Carlo claimed the observations of plaintiff established the following deficiencies: (1) plaintiff's lessons were not aligned to curriculum standards; (2) he did not differentiate activities for different grade levels; (3) his interactions with students were inconsistent; (4) his classroom lacked the required instructional artifacts (visual aids) and overall appropriate rigor; and (5) his very basic understanding of strategies to create an appropriate environment had resulted in incidents of unprofessional behavior. While points one through four had been raised in some fashion following plaintiff's observations, point five had not. On the contrary, Bauknight had praised plaintiff's classroom environment and his positive interactions with students following his twenty-week observation only a month earlier and before the J.O. incident.

Plaintiff's summative evaluation, conducted by Carlo, took place on March 31, 2009. Plaintiff received an overall insufficient rating, with

insufficient proficiency under all four sections. Carlo remarked that plaintiff's planning and understanding of the curriculum was at the beginning level of development; his ability to differentiate the instruction and activities to meet the needs of his students was not evident in his lessons; he remained at a basic level of understanding of the principles and strategies of effective classroom management; and he had not demonstrated the ability or understanding of consistent communication with students' families to prevent and/or stop academic problems or behavioral issues. Carlo's first three points echoed prior concerns. But, as to fourth point, Bauknight had commended plaintiff for his consistent and open communication with students' families following the twenty-week observation just a month earlier, and even Carlo had credited plaintiff for increasing communication with parents and guardians following the thirty-week observation, which occurred just four days before plaintiff's summative evaluation.

Plaintiff continued teaching through April 2009 and part of May 2009. He reported that J.O. continued to treat him with a total lack of respect. On May 11, 2009, defendant informed plaintiff that his contract would not be renewed for the 2009-2010 school year. Plaintiff promptly appealed to the Newark Board of Education, but the appeal was unsuccessful.

On May 20, 2009, plaintiff called defendant's main office and asked that J.O. be removed from his classroom because his attitude was becoming even more intimidating and disruptive. Office staff advised plaintiff that Carlo refused his request stating, "if [plaintiff] does not know what to do, tell him to go home." On May 22, 2009, plaintiff was suspended with pay.

On May 26, 2009, plaintiff went to the NPD to get a copy of the police report about the J.O. incident. When plaintiff learned there was no report, he filed a police report detailing the incident and the threat J.O. made to him. Plaintiff reported that he feared for his safety and his life after the incident and took J.O.'s threats very seriously.

## II.

Defendant contends that the court should have dismissed the complaint summarily because plaintiff did not establish a prima facie claim under CEPA. We disagree.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Thus, we consider, as the trial court did, "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the

alleged disputed issue in favor of the non-moving party." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (quoting Brill. v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).

"To defeat a motion for summary judgment, the opponent must 'come forward with evidence that creates a genuine issue of material fact.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005).

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Court Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial

judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013). Applying the above standards, we discern no reason to reverse.

"The Legislature enacted CEPA to 'protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct.'" Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)). As a remedial statute, CEPA "promotes a strong public policy of the State" and "should be construed liberally to effectuate its important social goal." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont, 138 N.J. at 431). When enacted, CEPA was described "as the most far reaching 'whistleblower statute' in the nation." Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998).

CEPA provides as follows, in pertinent part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
>      . . . .
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .;

. . . .

> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.
>
> [N.J.S.A. 34:19-3.]

CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). In order to establish a prima facie case of retaliation under N.J.S.A. 34:19-3(c), a plaintiff must demonstrate:

> (1) a reasonable belief that the employer's conduct was violating either a law, rule, regulation or public policy; (2) he or she performed a "whistle blowing" activity as described in N.J.S.A. 34:19-3(a) or (c); (3) an adverse employment action was taken against him or her;[5] and (4) a causal connection existed between his whistle-blowing activity and the adverse employment action.
>
> [Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 38 (App. Div. 2005).]

"The evidentiary burden at the prima facie stage is 'rather modest[.]'" Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447-48 (2005) (quoting Marzano v. Comput. Sci. Corp., 91 F.3d 497, 508 (3d Cir. 1996)). Moreover, "[t]hese

---

[5] Defendant does not dispute that plaintiff suffered an adverse employment action.

requirements must be liberally construed to effectuate CEPA's important social goals." Maimone v. City of Atl. City, 188 N.J. 221, 230 (2006).

If the plaintiff establishes a prima facie case of retaliation, "then the defendant [] must come forward and advance a legitimate, nondiscriminatory reason for the adverse conduct against the employee." Klein, 377 N.J. Super. at 38. Assuming the defendant makes that proffer, the "plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual" and that the true motive was retaliation. Id. at 39; see Kolb v. Burns, 320 N.J. Super. 467, 477-78 (App. Div. 1999) (applying "pretext" three-step analysis, as first described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to a CEPA case).

Defendant argues that plaintiff did not identify a statute, regulation or public policy defendant violated even if the alleged facts were true. Citing numerous special education regulations, defendant also argues it did not violate any law or public policy, as it was not required to suspend or discipline J.O. because he was a special education student, and its disciplinary decisions cannot be overturned unless arbitrary, capricious, or unreasonable. However, defendant misstates the relevant legal standard under CEPA, and this argument bears no relevance to the proper legal inquiry. More importantly, the discipline policy

applies to special education students unless the student's IEP includes an exemption. J.O.'s IEP is not in the record. Thus, there was no evidence he was exempt from the discipline policy.

Defendant also argues that the violation of an employer's internal policies cannot form the basis of a CEPA claim; plaintiff cannot establish a CEPA claim by reporting the unlawful activity of a third party; plaintiff did not show a causal connection between his whistle-blowing activity and the non-renewal of his contract; and plaintiff did not show that the non-renewal of his contract was a pretext for retaliation.

Whether Plaintiff Demonstrated a Reasonable Belief That Defendant's<br>Conduct Was Violating Either a Law, Rule, Regulation or Public Policy

"The goal of CEPA . . . is 'not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct <u>that they reasonably believe to be unlawful or indisputably dangerous to the public health, safety or welfare.</u>'" <u>Dzwonar</u>, 177 N.J. at 464 (emphasis added) (quoting <u>Mehlman</u>, 153 N.J. at 193-94). Notably, "CEPA does not require any magic words in communicating an employee's reasonable belief of illegal activity." <u>Beasley v. Passaic Cty.</u>, 377 N.J. Super. 585, 605 (App. Div. 2005).

As we have held:

> In order for a plaintiff to . . . withstand summary judgment under N.J.S.A. 34:19-3(c), he or she must "furnish the trial court with enough by way of proof and legal basis to enable the court to determine as a matter of law" that the plaintiff has identified "the asserted violation with adequate particularity" for a jury's consideration.
>
> [Klein, 377 N.J. Super. at 40 (quoting McLelland v. Moore, 343 N.J. Super. 589, 601 (App. Div. 2001)).]

To withstand summary judgment under N.J.S.A. 34:19-3(c)(1),"a plaintiff must set forth facts that would support an objectively reasonable belief that a violation has occurred." Dzwonar, 177 N.J. at 464. A plaintiff need not prove that the defendant actually violated the law, as defendant incorrectly contends here. Id. at 462.

To withstand summary judgment under N.J.S.A. 34:19-3(c)(3), a plaintiff must set forth facts sufficient to demonstrate he "reasonably believed the employer's conduct was 'incompatible' with a clear mandate of public policy expressed in a law, rule or regulation" that "concern[s] the public health, safety or welfare or protection of the environment." Maimone, 188 N.J. at 231-32 (alteration in original) (quoting N.J.S.A. 34:19-3(c)(3)). Significantly, a plaintiff need not establish that the employer actually "violated" the public policy at issue, as defendant also suggests. Id. at 231.

Next, "the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." Dzwonar, 177 N.J. at 464. "[A] pivotal component of a CEPA claim is the plaintiff's identification of authority in one or more of the categories enumerated in the statute that bears a substantial nexus to his or her claim." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 32 (2014). If the trial court finds such a substantial nexus, "the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Dzwonar, 177 N.J. at 464.

Plaintiff relied on the discipline policy and USM to establish a prima facie case of retaliation under N.J.S.A. 34:19-3(c)(1) and (c)(3). "[A] plaintiff who pursues a CEPA claim under [(c)(3)] may rely upon the same laws, rules and regulations that may be the subject of a claim under (c)(1)." Maimone, 188 N.J. at 231. Plaintiff also relied on the New Jersey Public Employees' Occupational Safety and Health Act (PEOSHA), N.J.S.A. 34:6A-25 to -50, to establish a prima facie case of retaliation under his (c)(3).

Relying on Dzwonar, Hitesman, and Klein, defendant argues that the violation of an employer's internal policies cannot form the basis for a CEPA claim. However, those cases are distinguishable.

In Dzwonar, the plaintiff, a paid arbitration officer for a hotel and restaurant employees' union, alleged her employer wrongfully discharged her after she repeatedly voiced concerns regarding the executive board's failure to read its minutes at general membership meetings. 177 N.J. at 456. The plaintiff believed that the board's behavior violated federal labor law and the union's internal bylaws. Ibid. The Court rejected the plaintiff's CEPA claim for two reasons. First, it held that the plaintiff's belief was not objectively reasonable because there was not a substantial nexus between the complained-of conduct and the federal statute. Id. at 465-68. Second, it held that the union bylaws were merely a contract between the union and its members, not a law, rule or regulation as is required to support a (c)(1) CEPA claim. Id. at 469.

In Hitesman, the plaintiff, a registered nurse, claimed his employer unlawfully terminated him after he complained about the rate of infectious diseases among patients. 218 N.J. at 14. The plaintiff's CEPA claim, brought pursuant to CEPA's improper quality of patient care provision codified at N.J.S.A. 34:19-3(a)(1) and (c)(1), was based upon standards set forth in a professional code of ethics, an employee handbook, and the employer's statement of patient rights. Id. at 14-15. The Court held that claims brought under the "improper quality of patient care" provision must be supported by

authority "that governs the employer and differentiates between acceptable and unacceptable conduct in the employer's delivery of patient care." Id. at 15. The Court rejected the plaintiff's CEPA claim because the code of ethics "provided no standard for his employer's control of infectious disease" and the employee handbook and statement of resident rights "neither defined acceptable patient care nor stated a clear mandate of public policy[.]" Id. at 15-16.

Klein involved another CEPA claim brought under the improper quality of patient care provision. 377 N.J. Super. at 38. The plaintiff, a doctor, alleged his employer-hospital retaliated against him "after he refused to be assigned to the Radiology Department based upon his 'reasonable belief that such anesthesia assignments were a threat to patients' safety.'" Id. at 33. This court rejected the plaintiff's claim, finding he had not sufficiently identified any illegal or unethical activity, or public policy violation and that he merely disagreed with the internal procedures and priorities of the hospital. Id. at 44-45. Though the plaintiff cited several state regulations pertaining to anesthesia, the court did not find a substantial nexus between those regulations and the complained-of conduct. Id. at 43-44.

Defendant's reliance on these cases is unavailing. This case does not concern a union's internal bylaws, as discussed in Dzwonar, or CEPA's

"improper quality of patient care" provision, as discussed in <u>Hitesman</u> and <u>Klein</u>. More important, unlike the sources in those cases, the discipline policy and USM specifically incorporate, and were promulgated pursuant to, state statutes and regulations.

Generally, N.J.S.A. 18A:11-1(c) requires district boards of education to "[m]ake . . . rules . . . for its own government . . . and management of the public schools and public school property of the district" that are consistent with state law and regulations. <u>See</u> <u>G.D.M. v. Bd. of Educ. of Ramapo Indian Hills Reg'l High Sch. Dist.</u>, 427 N.J. Super. 246, 258 (App. Div. 2012) (discussing local board's authority to regulate student conduct in accordance with state regulations).

Regarding discipline in particular, N.J.A.C. 6A:16-7.1(a) requires district boards of education to develop and implement "a code of student conduct that establishes standards, policies, and procedures for positive student development and student behavioral expectations on school grounds." The policy must include "[a] description of behaviors that result in suspension or expulsion, pursuant to N.J.S.A. 18A:37-2" and "[a] description of school responses to violations of behavioral expectations . . . that, at a minimum, are graded according to the severity of the offenses[.]" N.J.A.C. 6A:16-7.1(c)(2); N.J.A.C.

31

6A:16-7.1(c)(5). The discipline policy must also contain "a continuum of actions designed to remediate [violations] and, where necessary or required by law, to impose sanctions[.]" N.J.A.C. 6A:16-7.1(c)(5)(i).

The discipline policy here illustrates it was adopted pursuant to the statute and regulations cited above. The introduction refers to the discipline policy as a "Code of Conduct" and "provides a clear delineation of infractions categorized by levels of severity." Further, the discipline policy repeatedly cites the governing statutes and regulations, including N.J.S.A. 18A:11-1 and N.J.A.C. 6A:16-7.1, among many others. Thus, by its plain language, the discipline policy constitutes "a rule or regulation promulgated pursuant to law" under CEPA. N.J.S.A. 34:19-3(c)(1).

As for the USM, N.J.A.C. 6A:16-6.1(a) requires district boards of education to "adopt and implement policies and procedures to ensure cooperation between school staff and law enforcement authorities" in matters concerning "[t]he planning and conduct of law enforcement activities and operations on school grounds, including arrest procedures. . . ." N.J.A.C. 6A:16-6.2(b)(13) specifically requires district boards of education to develop and implement "[a] memorandum of agreement with appropriate law enforcement authorities."

The plain language of the USM illustrates it was adopted to comply with these regulations. Indeed, the first page of the USM states its adoption is "required" pursuant to N.J.A.C. 6A:16-6.2(b)(13) through (15). In addition, the USM cites to and incorporates pertinent state statutes and regulations on nearly every page. Therefore, the USM also constitutes "a rule or regulation promulgated pursuant to law" under CEPA. N.J.S.A. 34:19-3(c)(1).

Abbamont v. Piscataway Township Board of Education, 269 N.J. Super. 11, 24 (App. Div. 1993), aff'd, 138 N.J. 405, 424 (1994), also supports the conclusion that the discipline policy and USM constitute "a rule or regulation promulgated pursuant to law" under CEPA. There, the plaintiff, a non-tenured industrial arts teacher, alleged "he was not rehired in retaliation for his complaints about the inadequate ventilation in his shop[.]" Id. at 15. The plaintiff based his claim on the New Jersey Industrial Arts Education Safety Guide, which referred to and reproduced State safety regulations from the New Jersey Administrative Code. Id. at 16. The trial court rejected the plaintiff's CEPA claim, concluding he failed to cite any specific law, rule or regulation that defendant had violated. Id. at 23. However, both our Supreme Court and this court disagreed. Id. at 25; Abbamont, 138 N.J. at 425.

We concluded that the Safety Guide, which reproduced the provisions of relevant State regulations regarding outdoor air supply and exhaust requirements, was sufficiently specific and binding and constituted a regulation promulgated pursuant to law under N.J.S.A. 34:19-3(c)(1). Abbamont, 269 N.J. Super. at 23-24. The same is true here. See also Hernandez v. Montville Twp. Bd. of Educ., 354 N.J. Super. 467, 474 (App. Div. 2002) (accepting CEPA claimant's reliance on OSHA laws and a staff safety handbook as sufficient authority under N.J.S.A. 34:19-3(c)(1) to sustain his retaliation claim against his employer).

Contrary to defendant's argument, plaintiff clearly identified a rule or regulation promulgated pursuant to law (the discipline policy and USM), and set forth facts that would support his objectively reasonable belief that a violation had occurred. See N.J.S.A. 34:19-3(c)(1); Dzwonar, 177 N.J. at 464.

The discipline policy and USM also support plaintiff's (c)(3) claim because they contain clear mandates of public policy concerning public school safety. See Maimone, 188 N.J. at 231-32. "For purposes of CEPA, 'public policy has been defined as that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good.'" Hitesman, 218 N.J. at 28 (quoting Mehlman, 153 N.J. at 187).

Courts "look generally to the federal and state constitutions, statutes, administrative rules and decisions . . . to inform [their] determination [of] whether specific corrupt, illegal, fraudulent or harmful activity violates a clear mandate of public policy[.]" Mehlman, 153 N.J. at 188. That said, "a 'clear mandate' of public policy need not be enacted in a constitution, statute or rule, but must nonetheless provide a definite standard by which the employer's conduct may be gauged[.]" Hitesman, 218 N.J. at 33. "A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate." MacDougall v. Weichert, 144 N.J. 380, 392 (1996).

Both the Legislature and our courts have long recognized public school safety and security as important public policy concerns. See, e.g., N.J.S.A. 18A:17-42 ("The legislature finds that the safety and welfare of the public school students of this state while attending sessions of the public schools is a matter of prime concern to the citizens of this state"); State v. Best, 201 N.J. 100, 113 (2010) ("[T]he need for school officials to maintain safety, order, and discipline is necessary whether school officials are addressing concerns inside the school building or outside on the school parking lot."); Frugis v. Bracigliano, 177 N.J. 250, 268 (2003) ("No greater obligation is placed on school officials than to protect the children in their charge from foreseeable dangers, whether

A-4003-15T2

those dangers arise from the careless acts or intentional transgressions of others."); Abbott v. Burke, 153 N.J. 480, 514 (1998) ("Security is a critically important factor in the provision of a thorough and efficient education."); Kibler v. Roxbury Bd. of Educ., 392 N.J. Super. 45, 56 (App. Div. 2007) ("We surely are not indifferent to the safety of the dedicated professionals who work, day in and day out, to educate our children."); Abbamont, 269 N.J. Super. at 24-25 ("What is more important to a school environment than safety and a healthy environment?").

The discipline policy and USM are replete with clear mandates of public policy concerning school safety and security "that set[] a governing standard for the defendant employer's conduct." Hitesman, 218 N.J. at 33. For instance, the discipline policy states defendant is "committed to a discipline policy that creates a safe and orderly school environment" and defendant "expect[s] [its] schools and classroom environments to be emotionally safe[.]" The discipline policy also states "it is necessary that the school environment be free of disruptions which interfere with teaching and learning activities." To that end, the discipline policy outlines the four levels of disciplinary infractions along with specific procedures for handling those infractions. With respect to Level IV infractions, the policy requires administrators to verify the offense occurred,

confer with the parties involved, immediately remove the disruptive student from school, and contact law enforcement if the infraction constitutes a criminal offense, as it did here.

In addition, the USM acknowledges that offenses directing "actual or threatened infliction of bodily injury" toward students or school employees "not only undermine[] the educational environment, but can directly endanger the safety and well-being of members of the school community." The USM further states that students and school employees are entitled to an environment "free of the disruptive influence of crime, violence, intimidation and fear." To that end, the USM requires school employees to report to the NPD genuine threats "to cause death, serious bodily injury, or significant bodily injury to another person."

PEOSHA, contains a more general clear mandate of public policy concerning the public health, safety or welfare under N.J.S.A. 34:19-3(c)(3), as discussed in Abbamont, 269 N.J. Super. at 24-25. PEOSHA specifically includes any school district within its definition of "Employer" and requires those employers to provide employees "a place of employment . . . free from recognized hazards which may cause serious injury or death to . . . employees." Id. at 25 (quoting N.J.S.A. 34:6A-33(a)).

A-4003-15T2

Here, plaintiff clearly identified a clear mandate of public policy (public school safety) expressed in a law (PEOSHA), and a rule or regulation promulgated pursuant to law (the discipline policy and USM), and set forth facts sufficient to demonstrate he reasonably believed defendant's conduct was incompatible therewith. N.J.S.A. 34:19-3(c)(3).

Because defendant misstated the legal standard under the first element of a CEPA claim, it failed to address the next part of the inquiry – whether plaintiff demonstrated a substantial nexus between the complained-of conduct and a law or public policy identified by him. See Dzwonar, 177 N.J. at 464. For the sake of completeness, we address this issue.

Plaintiff demonstrated a substantial nexus between the complained-of conduct (returning J.O. to plaintiff's classroom and failing to report J.O.'s threat to the police) and the discipline policy, as the policy governs J.O.'s disciplinary infraction and defendant's response to that infraction. The discipline policy cites the definition of simple assault in N.J.S.A. 2C:12-1, which includes "[a]ttempts by physical menace to put another in fear of imminent serious bodily injury." Plaintiff's description of the J.O. incident, which must be viewed in the light most favorable to him, fits that definition. Simple assault is a Level IV infraction under the discipline policy. The discipline policy also cites terroristic

threats and use of a cell phone to facilitate the commission of a crime or to inflict injury or harm to persons or property as Level IV infractions. Plaintiff's description of the J.O. incident also falls within those categories of offenses.

The discipline policy states that assaults on teachers are considered fourth-degree crimes, not disorderly persons offenses, when the victim teachers are uninjured, as is the case here. The making of a terroristic threat constitutes a third-degree crime. N.J.S.A. 2C:12-3. In either case, for a Level IV infraction, the discipline policy required school officials to remove the student from the classroom, contact law enforcement, and assist in prosecuting the offending student. Thus, the plain language of the discipline policy bears a substantial nexus to the complained-of conduct.

Plaintiff also demonstrated a substantial nexus between the complained-of conduct and the USM. The USM requires school officials to notify the NPD of any genuine threats "to cause death, serious bodily injury, or significant bodily injury to another person." The USM further states that this requirement "shall be liberally construed with a view toward preventing future acts of violence."

All told, the discipline policy and USM bear a substantial nexus to the complained-of conduct for purposes of plaintiff's (c)(1) and (c)(3) claims, and

provide a standard against which defendant's conduct may be measured. Hitesman, 218 N.J. at 32-33.

We are less convinced there is a substantial nexus between the complained-of conduct and PEOSHA. PEOSHA has no specific provisions regarding school discipline or the reporting of threats to law enforcement, and does not provide "a definite standard by which the employer's conduct may be gauged" under the circumstances complained of here. Id. at 33; cf. Abbamont, 269 N.J. Super. at 24-25 (holding that plaintiff's "adequate ventilation" concern bore a substantial nexus to PEOSHA's clear mandate of public policy). However, this is not fatal to plaintiff's prima facie case. Because the discipline policy and USM strongly support plaintiff's (c)(3) claim, his reliance on PEOSHA is superfluous.

Whether Plaintiff Demonstrated He Performed a "Whistle-Blowing" Activity

In order to establish a prima facie claim under either section (c)(1) or (c)(3), plaintiff had to demonstrate he performed a whistle-blowing activity. Turner v. Associated Humane Soc'ys, Inc., 396 N.J. Super. 582, 595 (App. Div. 2007). A whistle-blowing activity consists of "objecting to or refusing to participate in an activity that violates the law, N.J.S.A. 34:19-3(c)(1), or objecting or refusing to participate in an activity deemed incompatible with a

clear mandate of public policy, N.J.S.A. 34:19-3(c)(3)." Ibid. "[T]he complained of activity must have public ramifications, and . . . the dispute between employer and employee must be more than a private disagreement." Maw v. Advanced Clinical Commc'ns, Inc., 179 N.J. 439, 445 (2004). "Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA." Battaglia, 214 N.J. at 559.

Defendant contends that plaintiff had not engaged in whistle-blowing activity because reporting the unlawful activity of a third party, J.O., is not protected conduct under CEPA. Defendant relies on three unpublished opinions, which bear no relevance to the present matter and do not constitute precedent or bind us. See Trinity Cemetery Ass'n, Inc. v. Twp. of Wall, 170 N.J. 39, 48 (2001); R. 1:36-3. In those cases, various courts determined that reporting the unlawful conduct of a third party did not constitute whistleblowing under CEPA.

Here, in contrast, plaintiff never contended the protected conduct involved only his reporting of J.O.'s threat. He contended his objection to defendant's violation of the discipline policy was the protected conduct at issue under CEPA.

A-4003-15T2

This implicates Bauknight's conduct in returning J.O. to the classroom and not reporting the threat to the police, not simply the fact that J.O. threatened plaintiff.

Moreover, the summary judgment record establishes that when Bauknight returned J.O. to plaintiff's classroom, plaintiff verbally objected and, ultimately, left due to his fear and distress over the situation. With the assistance of other school personnel, plaintiff contacted Freeman, the director of security, and the police following the incident. Plaintiff's dispute with defendant over Bauknight's response to J.O.'s threat constituted more than a private disagreement, because it implicated not only plaintiff's safety, but the safety of other students and staff in the building. Had J.O.'s "home boys" arrived at the school to carry out the threat and assault plaintiff, that disruption could have placed many others at risk of harm. To be sure, it would have resulted in an environment that was not conducive to student learning.

Based upon those facts, a reasonable jury could conclude that plaintiff objected to Bauknight's conduct and "blew the whistle" on how she handled the matter by contacting the authorities himself. Therefore, plaintiff met his prima facie burden to show he performed a whistle-blowing activity.

A-4003-15T2

In order to sustain a prima facie CEPA claim under either (c)(1) or (c)(3), plaintiff must demonstrate a causal connection between his whistle-blowing activity and defendant's failure to renew his employment contract. Defendant contends that plaintiff cannot meet this burden because his performance as a teacher, which led to the non-renewal of his contract, predated the J.O. incident.

Courts "have not required that there be proof of a direct causal link between the complaint by the employee and the retaliatory action of the employer." Battaglia, 214 N.J. at 558. Indeed, "jurors are permitted to draw an inference from all of the circumstances relating to the decision." Ibid. Here, the circumstantial evidence may include, but is not limited to, the "temporal proximity" of plaintiff's whistle-blowing activity and the non-renewal of his contract. See Maimone, 188 N.J. at 237. It may also include the response of plaintiff's superiors, Bauknight and Carlo, to his whistle-blowing activity. Battaglia, 214 N.J. at 559 (recognizing that "a supervisor who did not have the authority to subject the complaining employee to a retaliatory employment action but who prepared a biased evaluation because of the employee's CEPA-protected complaints might have sufficiently tainted the view of the actual decision maker to support relief").

Defendant's contention that plaintiff's teaching performance problems predated the J.O. incident does not negate plaintiff's ability to demonstrate a causal connection between his whistle-blowing activity and the non-renewal of his contract. Indeed, plaintiff presented facts sufficient to support an inference that the J.O. incident led defendant to retaliate against him by not renewing his contract.

First, plaintiff alleged that Carlo, who made the non-renewal decision, had a close relationship with J.O., which involved driving J.O. to school daily and allowing J.O. to spend time in his office. Plaintiff further said that Carlo was very angry at him following the J.O. incident, and the record shows both Carlo and Bauknight disciplined plaintiff one day after the incident while refusing to acknowledge that J.O. had actually threatened his life. Finally, Carlo's decision not to renew plaintiff's contract was made less than two weeks after the J.O. incident. See Turner, 396 N.J. Super. at 597 (holding that "the temporal proximity of plaintiff's objections and his discharge [less than a month later] allow an inference of a causal connection").

Having determined that plaintiff satisfied each element of his (c)(1) and (c)(3) claims, we conclude he established a prima facie case of retaliation sufficient to withstand summary judgment.

<u>Whether Plaintiff Raised a Genuine Issue of Material Fact as to Pretext</u>

The next question is whether defendant "advance[d] a legitimate, non-discriminatory reason" for its decision not to renew plaintiff's contract, and, if so, whether plaintiff "raise[d] a genuine issue of material fact that [defendant's] proffered explanation is pretextual." <u>Klein</u>, 377 N.J. Super. at 38-39. While defendant offered a legitimate reason for not renewing plaintiff's contract, it is clear that plaintiff met his burden to identify facts that tended to show defendant's explanation was pretextual.

Initially, the record supports defendant's contention that it had a legitimate, non-discriminatory reason for failing to renew plaintiff's contract: his poor teaching performance. Plaintiff's observation scores declined throughout the 2008-2009 school year, and defendant cumulatively rated his performance as insufficient in his annual summative evaluation. According to Bauknight and Carlo, plaintiff struggled with lesson planning and presentation despite having received training and support from his mentors and other administrators. Thus, defendant met its initial evidentiary burden under the pretext analysis.

At this point, however, the burden shifts back to plaintiff to establish that defendant's explanation is pretextual, i.e., that "retaliatory discrimination was

45

more likely than not a determinative factor in the decision." Kolb, 320 N.J. Super. at 479 (quoting Bowles v. City of Camden, 993 F. Supp. 255, 262 (D.N.J. 1998)). Significantly, "[p]laintiff need not prove that his whistleblowing activity was the only factor in the decision to fire him," just "that it made a difference." Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 296 (App. Div. 2001). To meet this burden, plaintiff "must demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." Kolb, 320 N.J. Super. at 478 (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)). Plaintiff may rely upon direct or circumstantial evidence, "or a combination of the two." Donofry, 350 N.J. Super. at 292.

Defendant contends plaintiff failed to show its reasons for not renewing his contract – plaintiff's poor teaching performance – were a pretext for unlawful retaliation. The record shows otherwise. For one thing, the written ratings plaintiff received from Carlo and Bauknight following plaintiff's observations and summative evaluation contain contradictory statements that raise a genuine issue of fact as to defendant's motive for not renewing plaintiff's contract. See Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 102 (2000) (concluding that in a CEPA case, "a jury could infer that [the defendant's] negative evaluation of

[the plaintiff] was a pretext designed to cover up [the defendant's] retaliation against [the plaintiff] for blowing the whistle on its sloppy and illegal practices").

Following plaintiff's ten-week observation in November 2008, Carlo gave plaintiff an A, the highest rating possible, for "[c]reating a positive classroom climate that is socially, emotionally and physically safe," and commended him for striving to develop positive relationships with all students. After plaintiff's twenty-week observation, his rating in that category decreased from an A to an E, though Bauknight commended him for establishing "a learning community that demonstrates respect and rapport between teacher and student and student-to-student." Plaintiff maintained that although that observation occurred in February 2009, before the J.O. incident, Bauknight did not provide him with the written ratings until after the J.O. incident in late March, after the J.O. incident. The jury could reasonably infer that this lapse in time could have given Bauknight an opportunity to reconsider the rating she issued.

Subsequent to plaintiff's thirty-week observation, which took place unannounced just days after the J.O. incident, Carlo decreased that same rating again, from an E to a B, the lowest possible, but failed to identify any specific concerns about safety or the classroom climate that led to the rating reduction.

47

Notably, defendant's guidebook encouraged, but did not require, Carlo to announce the upcoming thirty-week evaluation to plaintiff for his benefit. Nonetheless, the jury could reasonably infer that Carlo did not give plaintiff prior notice of the observation for retaliatory reasons.

Finally, in plaintiff's summative evaluation, Carlo concluded that plaintiff remained at a basic level of understanding of the principles and strategies of effective classroom management, without providing further explanation. That conclusion arguably contradicts the ten- and twenty-week observation scores referenced above and suggests that plaintiff's whistle-blowing activity "was more likely than not a determinative factor in the decision" not to renew his contract. Kolb, 320 N.J. Super. at 479 (quoting Bowles, 993 F. Supp. at 262).

Thus, a reasonable jury could infer Bauknight and Carlo decreased plaintiff's performance ratings after the J.O. incident in retaliation for the fact that plaintiff contacted school security and the police, and Carlo used those biased ratings to support the decision not to renew plaintiff's contract. See Fleming, 164 N.J. at 102.

Apart from the observations and evaluations, there was other circumstantial evidence that raised a genuine issue of material fact about defendant's reason for the non-renewal of plaintiff's contract. Plaintiff described

48

how Carlo had taken a special interest in J.O. and had a relationship with him off school grounds. Plaintiff also noted how Carlo and Bauknight, who had been supportive of him before the J.O. incident, treated him differently thereafter. Plaintiff explained that Carlo got angry with him and disciplined him after the J.O. incident for leaving his classroom to find Whitaker; yelling at Pryor; tossing J.O.'s book bag into the hallway; calling Freeman and bypassing Bauknight; and using inappropriate language in front of his students. As a result, a reasonable jury could infer that Carlo was particularly angry at plaintiff for contacting Freeman and the police because of his special relationship with J.O., and that these factors contributed to his non-renewal decision. Ultimately, the jury here did find the evidence supported plaintiff's CEPA claim, and "the jury's verdict is entitled to great deference." Estate of Roach v. TRW, Inc., 164 N.J. 598, 612 (2000).

In conclusion, we are satisfied that the court properly denied defendant's motion for summary judgment.

Lastly, defendant contends the court erred in barring testimony from plaintiff's mentors, Ramos and Whitaker, and Veru about his performance.[6] Defendant argues that assuming the evidence was privileged under N.J.A.C. 6A:9-8.6(c), plaintiff waived the privilege by suing defendant and challenging his termination.

Plaintiff was a provisional teacher under the alternate route program. N.J.A.C. 6A:9-8.6(c), recodified at N.J.A.C. 6A:9B-8.6(e), provides as follows:

> Mentor teachers shall not assess or evaluate the performance of provisional teachers. Interactions between provisional teachers and experienced mentor teachers are formative in nature and considered a matter of professional privilege. Mentor teachers shall not be compelled to offer testimony on the performance of provisional teachers.

The court barred the mentor testimony about plaintiff's teaching performance based on the regulation, finding plaintiff did not waive the regulatory privilege just because he put his job performance in issue.[7] The court

---

[6] The court permitted Whitaker and Veru to testify about the training and support they provided to plaintiff, but not their opinions about his job performance.

[7] The court also excluded handwritten notes from plaintiff's mentors, but defendant does not challenge that determination on appeal. Indeed, defendant

also found the mentor testimony was not relevant to any ultimate issue in the case since Carlo testified at his deposition that he did not consider the mentors' assessment of plaintiff's performance when deciding whether to renew plaintiff's contract.

"When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). We will reverse an evidentiary ruling only where "there has been a clear error of judgment" which resulted in "a manifest denial of justice." State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting Brown, 170 N.J. at 147). Additionally, "a judgment will be affirmed on appeal if it is correct, even though 'it was predicated upon an incorrect basis.'" Serrano v. Serrano, 367 N.J. Super. 450, 461 (App. Div. 2004) (quoting Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968)), rev'd on other grounds, 183 N.J. 508 (2005).

Courts interpret regulations in the same manner as statutes. U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012). "Whether construing a statute or a

---

conceded during argument that Carlo had neither received nor considered those notes when deciding not to renew plaintiff's contract.

regulation, it is not our function to 'rewrite a plainly-written enactment,' or to presume that the drafter intended a meaning other than the one 'expressed by way of the plain language.'" Ibid. (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). Courts "must construe the regulation as written." Ibid.

"[A]ll relevant evidence is admissible unless excluded by another evidential rule or statute." State v. Castagna, 400 N.J. Super. 164, 174 (App. Div. 2008); see also N.J.R.E. 401 ("'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action"). "As a general rule, we construe testimonial privileges narrowly because they prevent the trier of fact from hearing relevant evidence and thereby 'undermine the search for truth in the administration of justice.'" State v. J.G., 201 N.J. 369, 383 (2010) (quoting State v. Williams, 184 N.J. 432, 444 (2005)); see State v. Mauti, 208 N.J. 519, 531 (2012) ("[P]rivileges stand in what we have declared to be a 'disfavored status' because they have an effect on the truth-seeking function." (quoting Payton v. N.J. Prk. Auth., 148 N.J. 524, 539 (1997))).

Defendant does not address the relevance issue. However, the regulatory language is clear: a mentor is not tasked with "assess[ing] or evaluat[ing]" a provisional teacher's performance. N.J.A.C. 6A:9B-8.6(e). Setting the privilege

issue aside for the moment, this regulatory language supports the court's conclusion that the excluded testimony was not relevant. Moreover, Carlo's deposition testimony confirmed that while he considered the fact that plaintiff had received support from mentors, he did not consider their opinion of plaintiff's teaching performance when deciding not to renew plaintiff's contract. Because Whitaker was not responsible for assessing or evaluating plaintiff's performance, and Carlo acknowledged he did not consider plaintiff's mentors' opinions regarding his teaching performance, the excluded testimony bore no relevance to any of the ultimate issues in the case.

For the sake of completeness, we address whether the court's apparent application of the "mentor privilege" discussed in the regulation was proper. See Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) ("[A]ppeals are taken from orders and judgments and not from . . . reasons given for the ultimate conclusion"). The court's reliance on the privilege is arguably problematic, but not for the reasons defendant contends.

Defendant asserts on appeal, as it did before the trial court, that plaintiff waived the regulatory privilege by filing the CEPA lawsuit and placing the quality of his job performance squarely at issue. In support of this contention, defendant cites Olds v. Donnelly, 150 N.J. 424, 441 (1997) (explaining that

"[w]hen clients sue their attorneys, attorney-client communications may become discoverable" through the attorney's assertion of a defense) and Carchidi v. Iavicoli, 412 N.J. Super. 374, 381 (App. Div. 2010) (explaining that "a patient who brings an action in which his or her condition is an element or factor, waives the [physician-patient] privilege"). These cases do not concern the mentor privilege discussed in the regulation, and defendant's reliance upon these cases is inapposite.

The more salient question, which defendant has not raised, is whether the mentor privilege described in N.J.A.C. 6A:9B-8.6(e) is applicable at all in the context of Superior Court proceedings. N.J.S.A. 18A:4-15 authorizes the State Board of Education to "make and enforce . . . rules for its own government and for implementing and carrying out the school laws of this state under which it has jurisdiction." (Emphasis added). The regulations in chapter nine, before recodification, governed the preparation, licensure, and professional development of educators required to hold certificates, along with related proceedings before the State Board of Examiners (SBE). N.J.A.C. 6A:9-1.1; N.J.A.C. 6A:9-1.2.

The SBE is responsible for the issuance of teaching certificates, along with the revocation of those certificates when circumstances warrant such

action.  N.J.S.A. 18A:6-38; N.J.A.C. 6A:9B-3.2.  Revocation proceedings take place either before the SBE or at the Office of Administrative Law (OAL).  N.J.A.C. 6A:9B-4.6.  The enabling statute, when read together with the scope and purpose of the chapter nine regulations, supports the conclusion that the mentor privilege is only applicable in matters before the SBE or the OAL.  Defendant cites no authority in which the mentor privilege was invoked or applied.  See Mauti, 208 N.J. at 531-32 (explaining that privileges are disfavored and should be construed narrowly).  In any event, we conclude the court properly barred the mentor testimony on relevance grounds.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4003-15T2